471 P.2d 282

**Sharon STREENZ, a minor, by her Guardian Ad Litem, William J. Francy, Appellant,**

v.

**James T. STREENZ and Ramona Streenz, husband and wife, Appellees.**

No. 9894–PR.

Supreme Court of Arizona,
In Banc.

June 11, 1970.

Rehearing Denied July 7, 1970.

Carmichael, Johnson & Stephens, by N. Pike Johnson, Jr., Phoenix, for appellant.

Moore, Romley, Kaplan, Robbins & Green, by Robert H. Green, Phoenix, for appellees.

HAYS, Justice.

This case is before us on a petition for review of a decision of the Court of Appeals, Division Two, 11 Ariz.App. 10, 461 P.2d 186 (1969). The single issue raised is whether, in Arizona, an unemancipated child may bring suit against one of his parents for injuries received due to tortious acts of the parent. Relying on Purcell v. Frazer, 7 Ariz.App. 5, 435 P.2d 736 (1967), the Court of Appeals resolved this question in the negative. We vacate the opinion of the Court of Appeals, and overrule the holding of Purcell v. Frazer.

Sharon Streenz, an unemancipated minor, brought a personal injury action through her guardian ad litem against her parents, James and Ramona Streenz, for damages resulting from an automobile accident. Sharon was a passenger in a car driven by her mother. When Mrs. Streenz became temporarily blinded by the sun, her car went out of control, left the road, and crashed into a tree. Due to the collision, Sharon suffered injuries to her knees.

Defendants, Mr. and Mrs. Streenz, moved for summary judgment, which was granted. Defendants contended that the doctrine of "parental immunity," as set forth in Purcell v. Frazer, supra, prohibited Sharon from entertaining this suit. Sharon, on the other hand, contended that the "parental immunity" doctrine was limited to situations involving the exercise of parental control and discipline, and that since her suit was not concerned with these limited parental functions the granting of summary judgment was error. The Court of Appeals, relying on Purcell v. Frazer as authority, affirmed the judgment of the trial court, with Judge Lawrence Howard dissenting.

Purcell v. Frazer involved injuries to three minor children in circumstances similar to the present case. Judge Molloy, writing for a unanimous Court of Appeals, held that the family immunity doctrine applied in Arizona and that therefore the passenger children could not sue their father, the driver of the car, for negligence. The holding rested primarily on a "domes-

·tic tranquility" rationale, of which Judge Molloy wrote:

> "We are here concerned with a common activity in the typical American family. Children are often 'ferried' about by their parents. It is our belief that such a function is conducive to the well-being ·of both the children and the parent and is intimately connected with the welfare of a family. The family unit has been weakened by various economic and social changes in our modern world. This court is reluctant to take any step which might bring additional centrifugal force to bear upon the family structure." 7 Ariz.App. at 8, 435 P.2d at 739.

The court concluded that to permit child to sue parent in tort would disrupt family unity.

The parental immunity doctrine is a creature of American jurisprudence, having its foundation in the Mississippi Supreme Court decision of Hewlett v. George, 68 Miss. 703, 9 So. 885 (1891). That case held that because it was public policy to foster harmony and tranquility in the family unit, children should not be permitted to sue parents in tort. Since the Hewlett v. George decision was rendered, a majority of the state courts have adopted the parental immunity doctrine. See particularly McKelvey v. McKelvey, 111 Tenn. 388, 77 S.W. 664 (1903); Roller v. Roller, .37 Wash. 242, 79 P. 788 (1905); Teramano v. Teramano, 6 Ohio St.2d 117, 216 N.E.2d 375 (1966); Chaffin v. Chaffin, .239 Or. 374, 397 P.2d 771 (1964); Downs v. Poulin, 216 A.2d 29 (Me.1966); Capps ·v. Smith, 263 N.C. 120, 139 S.E.2d 19 (1964); Tucker v. Tucker, 395 P.2d 67 (Okla.1964); Castellucci v. Castellucci, 96 R.I. 34, 188 A.2d 467 (1963); Hastings v. Hastings, 33 N.J. 247, 163 A.2d 147 (1960); and cases collected at 19 A.L.R.2d 423, 439–42 (1951).

An examination of these cases applying the parental immunity doctrine reveals several principal policy reasons in support of the doctrine.[1] The domestic tranquility policy, however, is the rationale most frequently offered. 1 Harper and James, Law of Torts § 8.11 (1956) at 649.

Although most state courts have adopted the parental immunity doctrine, there have been notable exceptions. See Hebel v. Hebel, 435 P.2d 8 (Alaska 1967); Goller v. White, 20 Wis.2d 402, 122 N.W.2d 193 (1963); Briere v. Briere, 107 N.H. 432, 224 A.2d 588 (1966); Balts v. Balts, 273 Minn. 419, 142 N.W.2d 66 (1966). In addition, the great majority of law review and treatise writers who have discussed the subject have been highly critical of the doctrine. Prosser, Law of Torts § 116 (3d Ed. 1964); 1 Harper and James, Law of Torts § 8.11 (1956); McCurdy, "Torts Between Parent and Child," 5 Vill.L.Rev. 521 (1960); Akers and Drummond, "Tort Actions Between Members of the Family— Husband and Wife—Parent and Child," 26 Mo.L.Rev. 152 (1961). We find that the rationale of these cases and legal authorities, arguing in favor of partial abrogation of the parental immunity doctrine, are more consistent with contemporary conditions and concepts of fairness.

Even in jurisdictions where parental immunity has been openly embraced, courts have evinced hostility for the doctrine by creating numerous exceptions to its application. Thus, in most states, an unemancipated child may sue his parents under contract or property theory. See Goller v. White, supra, 122 N.W.2d at 197. In the negligence field, Missouri permits the dependent child to bring an action against the personal representative of a deceased parent. Brennecke v. Kilpatrick, 336 S.W.2d 68 (Mo.1960). In California, as in many other states, parental immunity does

---

1. See McCurdy, "Torts Between Parent and Child," 5 Vill.Law Rev. 521, 528–29 (1960). The principal reasons stated are (1) disturbance of domestic tranquility, (2) danger of fraud and collusion, (3) depletion of the family ex-chequer, (4) the possibility of inheritance, by the parent, of the amount recovered in damages by the child, and (5) interference with parental care, discipline and control.

not apply where the parent's tort is malicious or constitutes wilful misconduct. Emery v. Emery, 45 Cal.2d 421, 289 P.2d 218 (1955). In Ohio and Washington, if the parent is acting in the scope of his employment or occupation at the time of the alleged negligent act, parental immunity will not prevent a suit against him by his unemancipated child. Signs v. Signs, 156 Ohio St. 566, 103 N.E.2d 743 (1952); Borst v. Borst, 41 Wash.2d 642, 251 P.2d 149 (1952). These exceptions reflect distaste for the injustices which often result from a strict, pervasive application of the parental immunity rule.

Judge Howard's dissenting opinion in the Court of Appeals' treatment of the instant case points out an additional inequity created by the parental immunity rule:

"The manifest injustice of the blanket immunity is brought home by the following example. Two siblings reside under the same parental roof. One is an unemancipated minor aged 17 years and the other an emancipated minor aged 16. The latter is a married daughter living at home while her husband is serving an Army hitch overseas. While both are riding as passengers in a car driven by the father, an accident occasioned by the father's negligence occurs, resulting in injuries to both children. The parental immunity doctrine bars an action by the unemancipated 17 year old, but not by the married daughter." 11 Ariz.App. 10 at 12, 461 P.2d 186 at 188.

Certainly the likelihood of domestic strife is not diminished by prohibiting the 17 year old child from bringing suit.

■ We feel that two principal factors undermine Judge Molloy's "domestic tranquility" rationale expressed in Purcell v. Frazer, supra, and compel an overruling of that case. One factor, as expressed above, is that the common law has long permitted child to sue parent in property or contract. It is not unsafe to say that some of the most bitter family disputes arise over property, and yet parental immunity does not limit causes of action in this area. Is it reasonable to say that our law should protect the property and contract rights of a minor more zealously than the rights of his person? Secondly, we cannot ignore the almost universal existence of liability insurance, particularly in the automobile accident realm. Where such insurance exists, the domestic tranquility argument is hollow, for in reality the sought after litigation is not between child and parent but between child and parent's insurance carrier. In this respect, we quote with approval the following from Hebel v. Hebel, supra:

"We are of the further view that although the existence of liability insurance does not create liability its presence is of considerable significance here. To persist in adherence to family-harmony and parental-discipline-and-control arguments when there is automobile liability insurance involved is in our view unrealistic. If there is insurance there is small possibility that parental discipline will be undermined, or that the peace of the family will be shattered by allowance of the action." 435 P.2d at 15.

The Purcell v. Frazer decision makes much of the fact that the decisions which have abrogated parental immunity have not limited their scope to situations where liability insurance exists. Although we agree with Hebel, supra, that "the existence of liability insurance does not create liability" where none existed before, we think the widespread prevalence of such insurance is a proper element to consider. Where insurance is available to compensate the child for his injuries, the possibility of disruption of family unity and peace is negligible. On the other hand, where insurance is nonexistent, we doubt that suits by unemancipated minor children against their parents will be frequently entertained. Overwhelmingly weighted against the possibility of such disruptive suits is the vital interest of the public in protecting its members from loss caused by another's negligence. To tell children that their "pains must be endured for the peace and welfare of the family is something of a mockery." Dissenting opinion of Justice

Fuld, in Badigian v. Badigian, 9 N.Y.2d 472, 215 N.Y.S.2d 35, 174 N.E.2d 718, 724 (1961).

The argument is also advanced that by permitting an unemancipated child to sue his parent in tort would be to encourage fraud and collusion, particularly where liability insurance exists. Such possibility does exist, of course, but the same danger is present, to some degree, in all liability insurance cases. In a recent New York case, in which it was held that intra-family suits for nonwilful torts are permissible, the New York Court of Appeals stated:

"The argument fails to explain how the possibility of fraud would be magically removed merely by the child's attainment of legal majority. Nor does the argument pretend to present the first instance in which there is the possibility of a collusive and fraudulent suit. There are analogous situations in which we rely upon the ability of the jury to distinguish between valid and fraudulent claims. The effectiveness of the jury system will pertain in the present situation. The definite and vital interest of society in protecting people from losses resulting from accidents should remain paramount." Gelbman v. Gelbman, 23 N.Y.2d 434, 297 N.Y.S.2d 529, 245 N.E. 2d 192, 194 (1969).

Our holding today is not a total abrogation of the parental immunity doctrine. Rather, we agree with Judge Howard that "the role of *paterfamilias* should not be usurped by the judiciary as to intrafamilial activities involving parental discipline, care and control." 11 Ariz.App. at 13, 461 P. 2d at 189. The Wisconsin Supreme Court, in Goller v. White, supra, recognized this important aspect of parental discretion, and held that the parental immunity doctrine "ought to be abrogated except in these two situations:

(1) Where the alleged negligent act involves an exercise of parental authority over the child; and

(2) where the alleged negligent act involves an exercise of ordinary parental discretion with respect to the provision of food, clothing, housing, medical and dental services, and other care." 122 N. W.2d at 198.

These exceptions were more fully explained in a subsequent Wisconsin decision, Lemmen v. Servais, 39 Wis.2d 75, 158 N. W.2d 341 (1968):

"The immunity granted by these two exceptions is accorded the parent, not because he is a parent, but because as a parent he pursues a course within the family constellation which society exacts of him and which is beneficial to the state. The parental non-liability is not granted as a reward, but as a means of enabling the parents to discharge the duties which society exacts." 158 N.W.2d at 344.

■ While we are persuaded that parental immunity from tort action by an unemancipated child should be retained for limited purposes such as those set down by the Wisconsin court, we find it unnecessary at this time to delineate the scope in which the parental immunity rule will be applied. Our holding, permitting Sharon Streenz to sue her parents in tort, is limited to the factual situation before us. We specifically hold that an unemancipated minor child has a right of action against her parents for injuries incurred in an accident allegedly caused by her mother's negligent driving.

The Court of Appeals' opinion is vacated. The trial court's granting of defendant's motion for summary judgment is reversed, and the case is remanded for further proceedings consistent with this opinion.

LOCKWOOD, C. J., and STRUCKMEYER, V. C. J., concur.

McFARLAND, Justice (dissenting).

I am forced to dissent because there has been presented no persuasive authority that the cure proposed by the majority is not worse than the disease.

The single question presented in this case is simple enough: should an uneman-

cipated child be permitted to maintain a cause of action against its parents for damages resulting from the parents' tortious conduct. Although this is an automobile negligence case, the striking down of the immunity doctrine is not limited to this field. The implications in the majority opinion make it plain that the area they have opened is analogous to Gertrude Stein's famous Rose; a tort is a tort is a tort. If the immunity from suit is removed for an automobile tort, it follows logically that it is removed for all negligent acts—for example, those which may occur in the sanctity of the home. Needless to say, the "sanctity" also includes the "secrecy" of the home.

A vacuum cleaner forgetfully kept near an entrance; an open, live toaster wire carelessly ignored by the do-it-yourself father; a teakettle or pot of boiling water unthinkingly left within the reach of a toddler, all become the elements of a suit by the infant child against his parents. It takes but little imagination to conceive of almost unlimited examples. Liability lurks in every corner of the household. And when tragedy strikes through the inadvertent, but nevertheless tortious, hand of the child's parent (let us say the father), that same parent must decide—or at least participate in a family decision—whether or not suit should be instituted for the benefit of the child. The father must decide whether his duties as a father compel him to pass upon the possibility of a recovery against himself for accidental injuries to his child of tender years and take the child to some one to act as guardian ad litem to bring the suit against himself. The father must then assume the role of the defendant, and, presumably, assist in good faith in the defense of the suit in accordance with the terms of the "cooperation clause" of his insurance policy.

Similar fears were expressed by the majority of the New Jersey Supreme Court, in Hastings v. Hastings, 33 N.J. 247, 163 A.2d 147:

"* * * Again, practically speaking an action is not going to be commenced unless the family member to be sued is in effect prepared to say that he was negligent. The decision for the child to sue will be determined within the family circle and obviously the proposed defendant is going to participate in making it, quite an unorthodox situation under our basic concept of adversary litigation, to say the least. The risk of collusion is indeed a very great and human one, when the insured's own flesh and blood and the family pocketbook are concerned. It is unlikely in most instances that the insurance carrier, whose interests are the only ones really at stake, can adequately defend itself. The defendant under the insurance contract has the obligation to cooperate with the insurer, an obligation which, unless there is absolutely no question of his sole or concurrent and proximate negligence (a somewhat rare situation in everyday life), he will find it difficult to fulfill and at the same time further the successful outcome of the suit for the benefit of the child (and incidentally his own), which in reality is what he wishes to accomplish. The possibility of collusion, and the corollary of breakdown of most desirable individual integrity within the family frequently involving children as well, is so great in so many cases of the kind before us that we feel constrained to conclude, in conjunction with the other considerations previously mentioned, that sound public policy precludes their prosecution. It may be urged that the possibility of similar fraud also exists in other situations where our law permits suits, as in actions by guest against host, but we are convinced that the danger is not so great and the matter of integrity within the family is not involved."

Furthermore, the scope of the liability created here is not limited to child versus parent; if the doctrine of immunity is eliminated parents will be able to sue their children.

Many of the cases in support of the immunity doctrine stress, in its justification, the great possibility of collusive suits be-

tween parent and child.[1] Those cases which have overturned the doctrine properly point out that collusion is an ever-present possibility in all tort actions—particularly where the parties are related (other than parent and child) or are close friends, and only require closer scrutiny by judges and juries. I prefer not to rest my opinion solely on an assumption of illegal collusion by parents, together with its concomitant inferences of perjury. But how far can we strain the loyalties of a parent torn between his moral principles and his concern for his offspring?

The other reasons give by the many cases in favor of parental immunity have been pointed out in the footnote to the majority opinion; they are that such litigation would disturb domestic tranquility; deplete the family treasury; interfere with family discipline; or to prevent the possibility of inheritance, by the offending parent, of the amount recovered on behalf of the child.

The reason to prevent the possibility of inheritance is of dubious merit, and were it the only one presented in support of the doctrine of parental immunity I would have no hesitation about joining the majority in their opinion.

A dissenting opinion was filed in this case in our Court of Appeals, 11 Ariz.App. 10, 461 P.2d 186, and is quoted with approval by the majority opinion here. Both opinions cite cases which have tumbled these remaining principles supporting parental immunity. As for depletion of the "family exchequer" the New Hampshire Court, in Briere v. Briere, 107 N.H. 432, 224 A.2d 588, was quoted as follows:

"As to the depletion of the family exchequer, the court in the *Dunlap* case summarily rejected this argument as having no substantial weight and said that it ignored 'the parent's power to dis-

tribute favors as he will, and leaves out of the picture the depletion of the child's assets of health and strength through the injury.' [Citation omitted] To this may be added today's reality that if the father has means, he will almost inevitably carry insurance, and if he has not, the chances of anyone bringing suit for the child are remote. [Citation omitted] We agree that the existence of insurance should not impose a duty upon a parent where none existed before. [Citation omitted] However, as a practical matter, the prevalence of insurance cannot be ignored in determining whether a court should continue to discriminate against a class of individuals by depriving them of a right enjoyed by all other individuals. [Citations omitted]"

Preservation of "domestic tranquility" and "parental discipline" are discarded by the following quotes:

"We are of the further view that although the existence of liability insurance does not create liability its presence is of considerable significance here. To persist in adherence to family-harmony and parental-discipline-and-control arguments when there is automobile liability insurance involved is in our view unrealistic. If there is insurance there is small possibility that parental discipline will be undermined, or that the peace of the family will be shattered by allowance of the action." Hebel v. Hebel (Alaska) 435 P.2d 8

"* * * family peace and parental authority, in the overwhelming majority of cases, will be threatened less by an unemancipated minor's suit for tort against a parent, where the latter is generally protected from loss by insurance, than by an action for breach of contract or to enforce property rights where the parent would ordinarily have to pay a verdict

1. There is no need to burden this opinion with a reiteration of the cases which hold this and the other reasons given in support of the doctrine. Several are cited in the majority opinion and, as there pointed out, the earlier cases are collected in 19 A.L.R.2d 423, and are supplemented in 3 A.L.R.2d, Later Case Service, 34. A lengthy compilation of articles condemning the doctrine can be found in the dissenting opinion in Hastings v. Hastings, supra.

from his own pocket. [Citations omitted]" Briere v. Briere, supra

In place of the above-enumerated principles in favor of immunity, I find the contrary argument capsuled in one phrase, to the effect that the abrogation of the immunity doctrine is "more consistent with contemporary conditions and concepts of fairness." But nowhere—be it text writers, law-review articles, or judicial opinions—has there been a satisfactory explanation of how our present-day "concepts of fairness" differ from the past or what currently changed conditions require an immediate excision of this "diseased" organ of jurisprudence. Of course, a cursory reading of most of the cited authorities will leave little doubt in the reader's mind that the "changed concepts and conditions" is "the wide prevalence of liability insurance in personal injury actions. * * *" Goller v. White, 20 Wis.2d 402, 122 N.W.2d 193. The Briere case, supra, phrases it that as a "practical matter, the prevalence of insurance cannot be ignored," but in the same breath underscores the potential collusiveness of such suits with the statement:

"* * * To this may be added today's reality that if the father has means, he will almost inevitably carry insurance, and *if not, the chances of anyone bringing suit for the child are remote."* [Emphasis added.]

In the average family—that is, one with no pre-existing disruption—the "anyone" in the above quotation would be the child's mother, or guardian ad litem, with the considered advice and consent of the father and then only after a careful reading of his insurance policies. This is a clarion-call to moral, of not legal, collusion, at the expense of the insurance carrier. The majority opinion frankly expresses the practical relationships in child-parent litigation:

"* * * Secondly, we cannot ignore the almost universal existence of liability insurance, particularly in the automobile accident realm. Where such insurance exists, the domestic tranquility argument is hollow, for in reality the sought after litigation is not between child and parent but between child and the parent's insurance carrier. * * *"

To this can be added the converse situation that the litigation is not between parent and the child-tortfeasor, but between parent and the parent's insurance carrier.

And, while on the topic, we may just as well be thoroughly practical and admit that in "contemporary conditions" insurance companies operate on a profit basis, delegating the risks of increase loss experience to their patrons in the form of increased premiums. Equally realistic is the prevalence of medical-payment coverage, regardless of fault, in most automobile and home-owner's policies, together with the wide-spread custom of carrying hospitalization, surgical and dental coverage. These cover most, if not all, of the expenditures from the "family exchequer" needed to heal the unfortunate child. The superimposition of liability reimbursement—pain and suffering, loss of services, etc., as distinguished from indemnity for actual expenses—seems more to be balm for the wounded feelings of the parent-tortfeasor than for the physical suffering of the child.

I cannot believe the concept of a mother or father has materially changed with present conditions; that is, a dedicated parent is willing to suffer any deprivation, even the loss of life itself, for the well-being of his children. Even wild beasts are known to possess this trait. Now we are going to demand that parent to respond in damages, possibly after a trial, for an unintentional and no doubt greatly regretted, lapse in his diligent care for his offspring. That an insurance company may pay the money does not alter the principle. I am not prepared to concede that the value of the family relationship can be measured in dollars and cents. These concepts were expressed in Hastings v. Hastings, supra:

"* * * It appears quite unseemly, to say the least, to suggest that a mere act or omission within the family circle

amounting to no more than carelessness, which the one to blame would do almost anything to avoid, should require the payment of money by one member of the group to another. We believe that true family life, so important to our civilization, should not include among its foundation stones the concept of recompensable fault between parents and unemancipated children. The idea seems utterly foreign, whether a family member or some third party is compelled to produce the money."

Hastings contains the touchstone of the parental-immunity doctrine—the family. Terms such as "family exchequer," "parental discipline," and "domestic tranquility" are merely suggestive, but not truly expressive of this concept. Sir Henry Maine establishes the importance of the family thusly:

"The Roman and Hindoo systems of law from which I propose to illustrate my subject are very far indeed from being the only sources from which information can be gathered concerning the infancy of- mankind, or even concerning the Aryan race of men. But the evidence supplied by each of them is highly authentic, and, while both of them run back to what may fairly be called a vast antiquity, they both assume at their starting-point the existence of the institution, by no means apparently universal among savage men, out of which, as I said, all civilisation has grown—the Family. * * *" Maine, Early History of Institutions, p. 307

The family is the cornerstone, the very fabric of our form of government. For eighty years the immunity doctrine, with carefully carved-out exceptions, has been maintained with the intention of preserving this basic institution. Any proposal to eradicate the doctrine should be viewed critically and any action on such a proposal must come only after careful study of its potential results.

If the existence of insurance is the sole catalyst which causes the reaction against the time-honored rule of parental immunity, then I would leave it to the Legislature, with its greater ability to inquire into all facets of the problem, to revise completely this entire field of law. A statement in Badigian v. Badigian, 9 N.Y.2d 472, 215 N.Y.S.2d 35, 174 N.E.2d 718, still retains its validity despite the over-ruling of the decision in Gelbman v. Gelbman, 23 N.Y.2d 434, 297 N.Y.S.2d 529, 245 N.E.2d 192:

"The courts have alrady provided different treatment for situations where the injury occurs outside the normal familial relationship such as where the injury is wanton and intentional or where the tort is committed in the course of the parent's business. Perhaps some other special provision should be made for cases where disability extends beyond infancy, but it would be a great oversimplification to attempt to deal with those instances by a simple reversal of the settled rule. Inquiry and planning for any such protection is beyond the competence of a court and belongs with the Legislature."

Judge Burke in his opinion in Gelbman, supra, pointed out that he had agreed with the majority in Badigian, supra, but that in the seven-year interval between the two decisions there had been a continuing judicial erosion of the rule and that:

"During that same interval, legislative intervention has not been forthcoming. * * * The inactivity of the Legislature since the time of our decision in *Badigian* illustrates the fact that the rule will be changed, if at all, by a decision of this court.

I would treat the matter in the same way (although not necessarily for seven years) by giving our legislature "first refusal" to come to grips with the problem.

The majority opinion follows the authorities which consider the parental immunity doctrine to be a court-created rule rather than being founded in the common law, or as expressed in the opinion—"a creature of American jurisprudence." Unfortunately, its genesis has become as controversial as

its continued existence. Some authorities claim it to be a rule of common law.[2]

The first serious consideration given to the question in the English courts resulted in the rejection of the doctrine by a divided seven-judge court in Scotland. Young v. Rankin, Scot's Law Times Rpts. 445 (1934). The majority of that court were of the opinion that the fact that the earlier English Reporters and text writers failed to mention the doctrine was proof that it never existed in the English Common Law. On the other hand, the minority were equally certain that this failure to comment on the doctrine was proof that the existence of the doctrine was so well taken for granted that it required no comment. Regrettably, the existence of the doctrine in Scotland was rejected, but its paternity was left in doubt.

Here in the United States there seems little doubt that parental immunity first saw the light of day with the Mississippi case of Hewlett v. George, 68 Miss. 703, sub nom. Hewellette v. George, 9 So. 885 (1891). Unfortunately, it involved malicious treatment by a mother and stepfather —an element which would not have been condoned in the later and more enlightened stages of the doctrine. See e. g., Goller v. White, supra. Soon Hewlett was joined by McKelvey v. McKelvey, 111 Tenn. 388, 77 S.W. 664 (1903); and Roller v. Roller, 37 Wash. 242, 79 P. 788 (1905). Both decisions were as regrettable as their progenitor.

The former denied recourse, on the grounds that it would cause family disharmony, to a child who was the victim of what we today term the "battered child syndrome." The latter, with no excuse and even less reason, refused to disturb the domestic tranquility on behalf of a young girl who was raped and ravaged by her father. From this sordid background emerged the doctrine of parental immunity.

Eventually, parental immunity became one of the established laws of the land; but not without a severe process of judicial refinement which, over many years and many decisions, struck away the sharp edges of severity spawned by the original trilogy, and honed it into a workable law. The majority opinion views this process as "evincing hostility for the doctrine." I consider this continued engraftment of exceptions on the application of any rule to be normal, judicial procedure. Judicial exceptions are equally compatible with the concept of improvement as they are with destruction.

However, it seems immaterial now, whether parental immunity descended from the Common Law, or is a creature of the American judiciary. The doctrine has become firmly imbedded in our jurisprudence over a span of eighty years by virtue of innumerable decisions from almost every State in the Union. I do not believe that courts should slavishly follow precedents. Judges are not eternally shackled to the decisions of their predecessors. On the other hand, I do not believe that precedents can be lightly disregarded. Mr. Justice Jackson aptly describes this in an article in Col.L.Rev. 45:1, at 26:

> "* * * While Judge Cardozo pointed out with great accuracy that the power of the precedent is only 'the power of the beaten track,' still the mere fact that a path is a beaten one is a persuasive reason for following it. * * *"

I find it inconceivable that so many courts have walked in error for so many years, even up to the present.

However, if there are now valid and pressing social reasons for the abrogation of the doctrine, the legislature should have the opportunity of inquiring into them, and, if necessary, revising this area of tort law.

UDALL, J., concurs in this dissent.

2. See cases cited in 19 A.L.R.2d 423, n. 20 at p. 431.