Falco *v.* Pados (et al., Appellant).

Argued January 19, 1971. Before Jones, Eagen, O'Brien, Roberts, Pomeroy and Barbieri, JJ.

*E. Jerome Brose,* with him *Frank S. Poswistilo,* and *Brose, Poswistilo & LaBarr,* for appellant.

*Norman Seidel,* with him *Gus Milides,* for appellees.

OPINION BY MR. JUSTICE EAGEN, October 12, 1971:

This is an appeal from the judgment entered below in an attachment execution proceeding. The facts stipulated by the parties are as follows:

Kristine Falco, an unemancipated minor, was injured while she was a passenger in an automobile operated by her mother, Edith Falco, when it became involved in a collision with an automobile operated by Stephen Pados.[1]

The minor, through her father, Edward Falco, as guardian, and the father in his own right instituted an action for damages solely against Pados. The latter

---

[1] The record does not disclose the circumstances of the accident, nor the full extent of the minor's injuries. It does disclose, however, that the minor lost an eye due to the mishap.

joined Edith Falco, as an additional defendant in the action, alleging that she was alone liable for the minor's injuries, or alternately, jointly liable with Pados therefor.

A jury trial resulted in a verdict in favor of the plaintiffs and against the original and the additional defendant in the total sum of $28,050.80.[2] Judgments were subsequently entered on the verdict and Pados' insurance carrier paid the plaintiffs $10,000, the maximum sum due under its policy. No further recovery was possible from Pados since he was judgment proof.

The plaintiffs then instituted the instant attachment execution proceeding against the Aetna Insurance Company (Aetna), the additional defendant's liability insurance carrier, as garnishee. Interrogatories were filed to which Aetna filed an answer raising the defense of intrafamily immunity. The parties then stipulated the facts of record and submitted the issue to the court for final decision as if each side to the litigation had entered a motion for summary judgment. Subsequently, the court entered a judgment in favor of *the minor plaintiff* against Aetna for $18,050. Aetna then filed this appeal.

The case presents the question of interspousal immunity, as well as parental immunity, although the court below in entering judgment failed to give the doctrines separate consideration. In our view, the claim of the minor plaintiff must be considered apart from that of her father, and this opinion will proceed accordingly.

## CLAIM OF KRISTINE FALCO

The question in this instance is whether under the facts of the case, the minor plaintiff, Kristine Falco,

---

[2] The record fails to disclose the specific amount awarded each plaintiff.

may recover the full amount of her verdict, even though to do so requires a garnishment of her mother's liability insurance policy.

Undeniably, it is currently the law in Pennsylvania that an unemancipated minor child may not maintain an action of trespass against either parent to recover damages for personal injuries resulting from that parent's negligence. *Parks v. Parks,* 390 Pa. 287, 135 A. 2d 65 (1957). Nor may a parent maintain such an action against his or her unemancipated child: *Silverstein v. Kastner,* 342 Pa. 207, 20 A. 2d 205 (1941); *Duffy v. Duffy,* 117 Pa. Superior Ct. 500, 178 A. 165 (1935). The rule has been one of public policy and the basic reasons therefor are said to be twofold: first, allowance of such an action would result in "discord in the home, disorganization of the family relation and the severing of the natural ties of affection," all of which the "state desires to prevent rather than promote." *Duffy v. Duffy,* supra, at 502; secondly, to permit such suits would be conducive to and provide encouragement for collusion, perjury and fraud.

In ruling that the minor plaintiff could garnish the mother's liability insurance policy, the court below reasoned that the instant case is distinguishable from an intrafamily dispute, since here the minor plaintiff instituted suit only against Pados, who, in turn, joined the mother as an additional defendant. Hence, the parent's presence in the litigation resulted from Pados' action and not that of her child. Secondly, the minor plaintiff did not testify against her mother, nor did the latter admit negligence, thereby making her insurer liable. Only Pados testified against the additional defendant, and the imposition of liability by the jury was not the product of dispute, contention or any other disruptive circumstances within the family circle.

The foregoing position is appealing, but its adoption would lead to future pitfalls. However, further discus-

sion will serve no purpose, because after thoughtful consideration, we have concluded that the doctrine of parental immunity has no rational purpose today, and henceforth will not be recognized in Pennsylvania.

"The doctrine of parental immunity for personal torts is only eighty years old, an invention of the American courts. Although the oft-compared rule of interspousal immunity reached back to the early common law, English law books record no case involving a personal tort suit between parent and child. (Dunlap v. Dunlap, 84 N.H. 352, 356, 150 A. 905 (1930) ; Prosser, Torts (3d ed. 1964), §116, p. 886; Annot. 19 A.L.R. 2d 423, 425 (1951) ; see McCurdy, Torts Between Persons in Domestic Relations, 43 Harv. L. Rev. 1030, 1059-1060 (1930) ). Since children have long been allowed to sue their parents in matters involving property, however, some scholars have concluded that 'there is no good reason to think that the English law would not permit actions for personal torts as well . . . .' (Prosser, op. cit. supra, §116, p. 886 (citing Reeve, Domestic Relations, p. 287 (1816) ; Eversley, Domestic Relations, p. 578 (3d ed. 1906) ; Dunlap v. Dunlap, supra, at 356). Modern decisions in Scotland and Canada have recognized such personal injury suits. (Young v. Rankin, (Scotland 1934) Sess. Cas. 499; Deziel v. Deziel, (Canada 1953) 1 D. L. R. 651, 653-654; see Prosser, op. cit. supra, §116, p.886.)" *Gibson v. Gibson*, 92 Cal. Rep. 288, 289, 479 P. 2d 648, 649 (1971).

American precedent began in 1891 with the case of *Hewlett v. George*, 68 Miss. 703, 9 So. 885, where the family immunity doctrine was first announced. There the Mississippi court held that a minor child could not maintain a false imprisonment action against her mother for maliciously confining her in an insane asylum. In reaching this result the court cited no authority, basing its decision on the rationale that, "The peace of

society . . . and a sound public policy, designed to subserve the repose of families and the best interests of society, forbid to the minor child a right to appear in court in the assertion of a claim to civil redress for personal injuries suffered at the hands of the parent." 68 Miss. 703, 711, 9 So. 885, 887 (1891).

The *Hewlett* decision was then followed by the Tennessee Supreme Court in *McKelvey v. McKelvey,* 111 Tenn. 388, 77 S.W. 664 (1903), and by the Washington court in *Roller v. Roller,* 37 Wash. 242, 79 P. 788 (1905). In the Tennessee case the court denied a minor the right to sue her father and stepmother for cruel and inhuman treatment. In the Washington case the court reversed the verdict which a child obtained against her father who had criminally ravished her. The *Hewlett, McKelvey* and *Roller* decisions "constitute the great trilogy upon which the American rule of parent-child tort immunity is based."[3] Although other states quickly took the same position,[4] the tendency has been to whittle away the rule by statute and by the process of interpretation, distinction and exception, until what we have left today is a conglomerate of paradoxical and irreconcilable judicial decisions.

It is firmly established that the emancipated child may sue the parent, and the parent may sue the emancipated child for negligent wrongs,[5] and that the unemancipated child may sue his parents for his proper-

[3] Akers & Drummond, Tort Actions Between Members of the Family—Husband & Wife—Parent & Child, 26 Mo. L. Rev. 152, 182 (1961).

[4] See, e.g., *Mesite v. Kirchenstein,* 109 Conn. 77, 145 A. 753 (1929); *Sorrentino v. Sorrentino,* 248 N.Y. 626, 162 N.E. 551 (1928); *Wick v. Wick,* 192 Wis. 260, 212 N.W. 787 (1927); *Taubert v. Taubert,* 103 Minn. 247, 114 N.W. 763 (1908).

[5] *Glover v. Glover,* 44 Tenn. App. 712, 319 S.W. 2d 238 (1958); *Wood v. Wood,* 135 Conn. 280, 63 A. 2d 586 (1948); *Bulloch v. Bulloch,* 45 Ga. App. 1, 163 S.E. 708 (1932).

ty.[6] There are authorities which have permitted an unemancipated minor to maintain an action for personal injuries wilfully or intentionally inflicted;[7] authorities which have allowed suits where the injuries were caused by unintentional but wilful reckless, or grossly negligent conduct;[8] and authorities which have held that the parental immunity rule does not prohibit a negligence action by an unemancipated minor against the estate of his deceased parent. *Kaczorowski v. Kalkosinski, Admr.,* 321 Pa. 438, 184 A. 663 (1936); *Vidmar v. Sigmund,* 192 Pa. Superior Ct. 355, 162 A. 2d 15 (1960); *Davis v. Smith,* 253 F. 2d 286 (3d Cir. 1958). And in *Minkin v. Minkin,* 336 Pa. 49, 7 A. 2d 461 (1939), this Court allowed an eight-year-old child to bring suit against his mother to recover damages for the death of his father alleged to have resulted from the mother's negligent operation of an automobile. The majority of the Court were of the opinion that the Death Statutes, which allowed a minor to share in compensation payable by one whose negligence caused his parent's death, indicated a legislative intent in this type of action to displace the public policy which disallowed generally actions by minors.

Not only has there been a steady erosion of the rule of intrafamily immunity for nonwilful torts, but twelve jurisdictions have abolished the doctrine altogether, following the lead of Wisconsin which was the first to do so in 1963 in *Goller v. White,* 20 Wis. 2d 402, 122 N.W. 2d 193 (1963). Other states which now allow children to sue their parents in tort include Alaska (*Hebel v. Hebel,* 435 P. 2d 8 (1967)); Arizona (*Streenz v.*

---

[6] Harper & James, Law of Torts, §8.11, at p. 647 (1956).

[7] *Brown v. Selby,* 206 Tenn. 71, 332 S.W. 2d 166 (1960); *Mahnke v. Moore,* 197 Md. 61, 77 A. 2d 923 (1951).

[8] *Nudd v. Matsoukas,* 7 Ill. 2d 608, 131 N.E. 2d 525 (1956); *Cowgill v. Boock,* 189 Or. 282, 218 P. 2d 445 (1950).

*Streenz,* 106 Ariz. 86, 471 P. 2d 282 (1970)); California (*Gibson v. Gibson,* 92 Cal. Rep. 288, 479 P. 2d 648 (1971)); Hawaii (*Tamashiro v. DeGama,* 450 P. 2d 998 (1969)); Kentucky (*Rigdon v. Rigdon,* 465 S.W. 2d 921 (1971)); Illinois (*Schenk v. Schenk,* 100 Ill. App. 2d 199, 241 N.E. 2d 12 (1968)); New Jersey (*France v. APA Transport Corp.,* 56 N.J. 500, 267 A. 2d 490 (1970)); New York (*Gelbman v. Gelbman,* 23 N.Y. 2d 434, 297 N.Y.S. 2d 529, 245 N.E. 2d 192 (1969)); North Dakota (*Nuelle v. Wells,* 154 N.W. 2d 364 (1967)); New Hampshire (*Briere v. Briere,* 107 N.H. 432, 224 A. 2d 588 (1966)); Minnesota (*Silesky v. Kelman,* 281 Minn. 431, 161 N.W. 2d 631 (1968)).

The above named jurisdictions realizing that the doctrine of parental immunity is based on considerations which cannot stand logical scrutiny in modern life have wisely, in our view, abandoned it. Today, we do likewise.

The instant case graphically demonstrates the incongruous results which the doctrine permits.

Herein, if Pados, the original defendant, had sufficient assets, the minor plaintiff could have recovered the full amount of her verdict from this defendant and then he would have been entitled to contribution from the additional defendant. Cf. *Puller v. Puller,* 380 Pa. 219, 110 A. 2d 175 (1955), and *Fisher v. Diehl,* 156 Pa. Superior Ct. 476, 40 A. 2d 912 (1944). But because the original defendant's liability insurance happened to be limited to $10,000, and he had no other assets from which recovery of the judgment could be effected, the minor plaintiff, if the immunity doctrine is held operative must be satisfied with less than one-half of the damages the jury awarded her for her injuries. Such a result is no friend of elementary logic.

The speculative theory of family disruption upon which the doctrine of parental immunity is largely

based has been criticized and rejected by legal scholars without exception. As they point out, it is the injury itself which is the disruptive act, and with today's skyrocketing health costs, one which often works the greatest hardship on the family unit. In a time of almost universal liability insurance, such unexpected hardship or ruin is needlessly inflicted by the immunity doctrine.

In this connection, it is also noteworthy that Pennsylvania law has never fashioned protection for parents against actions by their children involving property rights or breach of contract, where litigation can rise to great heights of antagonism. Yet, such protection has been created where the posture of the family is that of trying to repair a rupture by restoring one of its members to health.

The Supreme Court of Ohio, addressing itself to the paradox of this arbitrary distinction in *Signs v. Signs,* 156 Ohio State 566, 576, 103 N.E. 2d 743, 748 (1952), stated: "It seems absurd to say that it is legal and proper for an unemancipated child to bring an action against his parent concerning the child's property rights yet to be utterly without redress with reference to injury to his person.

"It is difficult to understand by what legerdemain of reason, logic or law such a situation can exist or how it can be said that domestic harmony would be undisturbed in one case and be upset in the other."

The second traditional ground which courts have used to uphold family immunity, the fear of fraudulent claims is likewise a tenuous basis for a per se rule denying recovery in all cases.

To the courts which have been intrepid enough to abolish this immunity rule it has seemed that the interest of the child in freedom from personal injury

caused by the tortious conduct of others was sufficient to outweigh any danger of fraud or collusion.[9]

As the Supreme Court of New Jersey succinctly put it in the case of *Immer v. Risko*, 56 N.J. 482, 267 A. 2d 481 (1970) : "In a day when automobile accidents are unfortunately becoming so frequent and the injuries suffered by the passengers are often so severe, it seems unjust to deny the claims of the many because of the potentiality for fraud by the few. Moreover, there is something wanting in a system of justice which permits strangers, friends, relatives and emancipated children to recover for injuries suffered as a result of their driver's negligence but denies this right to the driver's spouse and minor children who are also passengers in the same vehicle." 267 A. 2d at 488.

Juries and trial courts are constantly called upon to distinguish the frivolous from the substantial and the fraudulent from the meritorious, sometimes even reaching erroneous results in the process. Such flexibility, inherent in the judicial process, offers no reason for substituting for the case-by-case resolution of causes an artificial and indefensible barrier, such as the intrafamily immunity rule. In the last analysis it is much to be preferred that we depend upon the efficacy of the judicial process to ferret out the meritorious from the fraudulent rather than using a broad broom to sweep away a class of claims, a number of which are admittedly meritorious.

It will be argued that such a change in the law as we enunciate today should be left to the legislature. Judge FULD, Chief Judge of the New York Court of

---

[9] "Although collusion is a possible consequence of allowance of suits between parent and child, we think that our judicial system is adequate to discover them when they occur. More importantly, the injustice of denying recovery purely on a basis of family relationship outweighs the danger of fraud." *Tamashiro v. De Gama*, 450 P. 2d 998, 1001, 1002 (1969).

Appeals, adequately answered this contention in *Badigian v. Badigian*, 9 N.Y. 2d 472, 174 N.E. 2d 718 (1961), when he said at 724: ". . . it is urged, that, if there is a remedy it must be given by the Legislature, if there is to be a change, it may not be effected by the courts. This court has heard such arguments before and has answered them by saying that, where the rule is court made, it may be court modified if reason and a right sense of justice recommend it (citations omitted)." So too, in recent years this Court has had the fortitude and wisdom to effectuate changes in the law where "reason and a right sense of justice" recommend it. For example, see *Flagiello* case, 417 Pa. 486, 208 A. 2d 193 (1965); *Griffith* case, 416 Pa. 1, 203 A. 2d 796 (1964); *Smalich v. Westfall*, 440 Pa. 409, 269 A. 2d 476 (1970); *Reitmeyer v. Sprecher*, 431 Pa. 284, 243 A. 2d 395 (1968); and *Niederman v. Brodsky*, 436 Pa. 401, 261 A. 2d 84 (1970).[10]

Cries will also be heard about our failure to adhere to the principle of "stare decisis."

What was said in this regard by the Honorable Robert von MOSCHZISKER, who once served with distinction as a Justice and then Chief Justice of this Court is pointedly pertinent. "But if, . . . a prior judicial de-

---

[10] In *Flagiello v. Pennsylvania Hospital*, supra, we unequivocally eliminated the doctrine of immunity of charitable institutions from liability in tort.

*Griffith v. United Air Lines, Inc.*, supra, declared that the Lex Loci Delicti rule was no longer to be followed.

In *Smalich v. Westfall*, supra, we refused to impute the contributory negligence of the driver of a motor vehicle to an owner-passenger, while in *Reitmeyer v. Sprecher*, supra, we adopted the modern approach, holding a lessor to his promise to repair rented premises and imposing liability where he failed to do so and physical harm resulted to the tenant.

In *Niederman v. Brodsky*, supra, we abandoned the requirement of contemporaneous physical contact to collect damages for injuries caused by the negligence of another.

cision seems wrong in principle or manifestly out of accord with modern conditions of life, it should not be followed as a controlling precedent, where departure therefrom can be made without unduly affecting contract rights or other interests calling for consideration." von MOSCHZISKER, Stare Decisis, Res Judicata and other Selected Essays (1929).

We might also quote the words of this Court in *Olin Mathieson C. Corp. v. White Cross Stores,* 414 Pa. 95, 100, 101, 199 A. 2d 266, 268-69 (1964) : "While it is true that great consideration should always be accorded precedent, especially one of long standing and general acceptance, it doesn't necessarily follow that a rule merely established by precedent is infallible. Moreover, the courts should not perpetrate error solely for the reason that a previous decision, although erroneous, has been rendered on a given question. This is particularly true where no fixed rights of property are involved or where great injustice or injury will result by following the previous erroneous decision. If it is wrong it should not be continued. Judicial honesty dictates corrective action. As stated by this Court in Commonwealth ex rel. Margiotti v. Lawrence, 326 Pa. 526, 193 A. 46 (1937), at 530 and 531, quoting Cooley, Constitutional Limitations (8th Ed. 1927), Vol. 1, page 120, ' ". . . when a question involving important public or private rights, extending through all coming time, has been passed upon on a single occasion, and which decision can in no just sense be said to have been acquiesced in, it is not only the right, but the duty of the court, when properly called upon, to reexamine the questions involved, and again subject them to judicial scrutiny. We are by no means unmindful of the salutary tendency of the rule stare decisis, but at the same time we cannot be unmindful of the lessons furnished by our own consciousness, as well as by judicial history, of the

liability to error and the advantages of review." ' See also, Kelley v. Earle, 325 Pa. 337, 190 A. 140 (1937) ; West Coast Hotel Co. v. Parrish, 300 U.S. 379, 57 S. Ct. 578 (1937) ; and the opinion of Mr. Justice BRANDEIS in Burnet v. Coronado Oil & Gas Co., 285 U.S. 393 (1932)."

CLAIM OF EDWARD FALCO

In this instance the question for decision is whether or not the doctrine of interspousal immunity prevents the plaintiff, Edward Falco, from garnishing his wife's liability insurance policy to satisfy the jury award he recovered in his own right in the personal injury action involved.

At common law neither a husband nor a wife could sue the other for injuries due to torts committed by the other before or during coverture. This was based on the theory that a husband and wife are one person, one entity. See Prosser, Torts (3d ed. 1964) §116, p. 879. In Pennsylvania such suits are specifically proscribed by statutory enactment. See Act of June 8, 1893, P. L. 344, §3, as amended by the Act of March 27, 1913, P. L. 14, §1, 48 P.S. 111. In our view, the above statutory enactment prevents the plaintiff, Edward Falco, from recovering damages from his wife in the personal injury action involved, even though his rights are derivative, and even though payment of the damages awarded him will come from her liability insurance carrier via attachment execution proceedings.

In sum, we rule: (1) that the minor plaintiff is entitled to recover the full amount given her by the jury though it requires a garnishment of her mother's liability insurance; (2) that because of the statutory proscription in the Act of 1913, supra, the plaintiff, Edward Falco, may not effectuate such garnishment.

The judgment of the court is vacated, and the record is remanded with directions to enter an order consonant with this opinion.

Mr. Chief Justice Bell took no part in the consideration or decision of this case.

---

CONCURRING AND DISSENTING OPINION BY MR. JUSTICE ROBERTS:

I applaud our Court's abandoning its prior doctrine and embracing the modern view with respect to intra-family immunity, thereby bringing this Commonwealth into line with the ever increasing progressive repudiation of this rule. I only regret a similar interment was not accorded interspousal immunity of the sort present in this case.

The majority feels compelled to limit its reforms to intra-family actions on the basis of the Act of June 8, 1893, P. L. 344, §3, as amended, 48 P.S. §111, which provides: "Hereafter a married woman may sue and be sued civilly, in all respects, and in any form of action, and with the same effect and results and consequences, as an unmarried person; but she may not sue her husband, except in a proceeding for divorce, or in a proceeding to protect and recover her separate property; nor may he sue her, except in a proceeding for divorce, or in a proceeding to protect or recover his separate property; nor may she be arrested or imprisoned for her torts."

In my view, the instant case does not come within the ambit of this statute, for the act only proscribes suit instituted *directly* between one spouse and the other. See *Ondovchik v. Ondovchik,* 411 Pa. 643, 192 A. 2d 389 (1963). In the case now before us, the defendant Pados joined Mrs. Falco as an additional defendant; Edward Falco did not *institute* the suit against his wife. My comments in an earlier similar

situation are equally applicable here: "In the absence of any spousal conflict, dissension or disagreement created by the institution of the trespass action itself, there is no basis for concluding, as a matter of fact or policy, that domestic harmony is threatened or destroyed by litigation of the present nature. There is an obvious and significant difference in the impact which direct litigation . . . may have upon a marriage as contrasted to recovery, as here, on a judgment created by third party litigation in which both spouses unite in a joint effort to place liability upon an original defendant.

"All that is prohibited by our *statute* is a direct suit by one spouse against the other on a tort claim arising out of negligence. In the absence of a showing (or even a suggestion) that the circumstances here in any way offend the *judicially* announced public policy of preventing marital discord, there is no reason for denying the spouse enjoyment of the judgment. To do otherwise, on this record, is to employ the public policy doctrine where the reason for the rule does not, in fact, exist. So employed, the doctrine is not a concept for preserving domestic harmony, but becomes instead a misdirected application for defeating a fair and just result. Surely, developing concepts of proper responsibility for negligent conduct prompts the rejection of needless extensions of immunities.

"Realistically and practically, probably the only time one spouse will seek to secure the benefits of a judgment against the other in a trespass case will be in those instances where, as here, the husband has provided a fund for the satisfaction of such judgments by contract or liability insurance. This presents a situation which is *especially* and *particularly* free from concern that efforts to *satisfy* the judgment entail possibilities of marital discord. Undoubtedly, a wife is one

of the persons a husband most desires to protect by his purchase of insurance, . . . . I question the wisdom of a rule which needlessly and invisibly inserts a large immunity clause into a policy which, on its face, reads otherwise." *Daly v. Buterbaugh,* 416 Pa. 523, 542-43, 207 A. 2d 412, 420-21 (1964) (dissenting opinion) (citations omitted).

---

CONCURRING OPINION BY MR. JUSTICE POMEROY:

I agree that the parental immunity doctrine, as it generally has been applied, should be abrogated, and I join in the opinion of the Court subject to the caveat herein expressed. I believe, nevertheless, that these are areas of the parent-child relationship, unique in our society, to which the traditional concepts of negligence should not be applied. The Wisconsin Supreme Court, discarding the doctrine of parental immunity in *Goller v. White,* 20 Wis. 2d 402, 122 N.W. 2d 193 (1963), excepted two situations from the scope of its decision: "(1) where the alleged negligent act involves an exercise of parental authority over the child; and (2) where the alleged negligent act involves an exercise of ordinary parental discretion with respect to the provision of food, clothing, housing, medical and dental services and other care." In my view, the premise upon which the parental immunity doctrine has traditionally been supported, preservation of family harmony and parental authority, is a valid reason for recognizing the Wisconsin court's exceptions. While the facts of the case at bar do not involve the excepted areas, I add this caveat in light of the Court's statement that "the doctrine of parental immunity has no rational purpose today, and henceforth will not be recognized in Pennsylvania."