821 P.2d 273

**Rebel Lynn ROURK, a single woman, Plaintiff–Appellant,**

**v.**

**The STATE of Arizona, Arizona Department of Economic Security, an agency of the State of Arizona, Donnovan Myers, William Blount and Debra Lynn Blount, husband and wife, Defendants–Appellees.**

**No. 1 CA–CV 89–633.**

Court of Appeals of Arizona, Division 1, Department C.

Nov. 12, 1991.

Charles Anthony Shaw, Prescott, and S. Alan Cook, Phoenix, for plaintiff-appellant.

Jones, Skelton & Hochuli by Don C. Stevens, II, Phoenix, Attorney for defendants-appellees.

## OPINION

KLEINSCHMIDT, Judge.

The plaintiff, Rebel Lynn Rourk, was injured in an automobile accident when she was returning home from a teenage drinking party. She brought an action for negligent supervision against her foster parents and against the State of Arizona and the Arizona Department of Economic Security (DES) for negligently licensing the foster home in which she lived, and for negligently placing her in it. The trial judge granted partial summary judgment for the state and DES on the claim for negligent licensing. At the close of the plaintiff's case, he directed a verdict in favor of all defendants on all issues.

We hold that the parental immunity doctrine does not protect foster parents from suit for the negligent supervision of a foster child if the foster parents are not related to the child by blood, marriage or adoption, or are not providing long-term foster care in contemplation of adoption. We also hold that the negligence of the driver of the car in which Rebel Rourk was riding at the time of the accident was not a superseding cause of her injury that would preclude her recovery against the foster parents and the state. We also find sufficient evidence to support a finding that the state was grossly negligent in placing Rebel Rourk in the foster home and in failing to remove her from that home when it knew or should have known that she was not receiving adequate supervision. Accordingly, we reverse and remand for a new trial.

## FACTS

The evidence, in the light most favorable to the plaintiff, is as follows. In December 1984, Rebel Rourk was a seventeen-year-old girl in the care and custody of DES. She was suicidal and had once overdosed on drugs. A psychologist, Jeffrey Hatch–Miller, recommended that Rebel be placed in a therapeutic, or class three, foster home where she could be closely supervised. He also recommended that she receive immediate therapy.

The DES maintains three classifications for foster homes. A level one home is for children and teenagers without significant behavioral or emotional problems. A level two home is equipped to handle foster children with moderate behavioral or emotional problems, and a level three home can accept children with more severe behavioral or emotional problems who require constant monitoring and twenty-four-hour supervision.

In the spring of 1985, Donnovan Myers, a DES employee, placed Rebel in a foster home maintained by William and Debra Blount. The Blount home was a level one home, although the psychologist, Jeffrey

Hatch–Miller, was told, by whom is unspecified, that it was a level three home. No one from DES told the Blounts that Rebel had suicidal tendencies, that she suffered from severe depression, or that she had a problem with alcohol, although all of this was known to the state.

In addition to their own three children, the Blounts cared for four other foster children in their home. The foster children were frequently unsupervised and drank alcohol on several occasions. DES had been notified of at least two incidents involving lack of supervision and drinking. William Blount had a drinking problem and was frequently intoxicated. Debra Blount acted more like a friend to the children than a parent figure. Rebel was permitted to come and go as she pleased, and she was allowed to drink alcohol. She became intoxicated in the Blount home on five or six occasions. Debra Blount participated in drinking parties at the home and provided Rebel with a twelve-pack of beer on at least one occasion. The other foster children also drank alcohol and used drugs.

The week before the accident, Rebel and two other foster children had been given permission to go to the all-night movies, with a 3:00 a.m. curfew. During the course of the evening, Rebel met two men, Bruce Germain and Richard Tyree, who took her and the other foster children to a party at Lynx Lake, where young people were known to go to drink alcohol. Rebel became intoxicated on this occasion and did not arrive home until 4:00 a.m. She told Debra Blount that she had been at a party at Lynx Lake.

Rebel saw Germain and Tyree several times the following week with Debra Blount's knowledge. On Wednesday of that same week, Debra Blount went out of town, leaving all of the children in the care of her husband. Rebel asked William Blount for permission to go to Lynx Lake on Friday night. Blount agreed, and Rebel went to Lynx Lake with two other foster children and the two men, Germain and Tyree. Rebel had several drinks at the party, and she rode home with Germain, who had also been drinking. Germain was speeding and "playing chicken" when his vehicle was involved in an accident resulting in the death of two persons and serious injury to Rebel. Germain subsequently pled guilty to two counts of reckless manslaughter arising out of this accident.

Rebel sued the state, DES, Donnovan Myers and the Blounts, alleging that the state, DES and Myers had negligently licensed the Blounts as foster parents and had negligently supervised and monitored Rebel's placement with them. She alleged that the Blounts negligently failed to supervise her while she was in their care and that the state and DES were liable for the Blounts' negligent supervision. The trial court entered summary judgment in favor of the state and DES on the negligent licensing claim. At the subsequent trial, the court granted the defendants' motions for directed verdicts on all the remaining claims.

■ On an appeal from a directed verdict or summary judgment, the evidence must be viewed most favorably to the opposing party. *Hoffman v. Greenberg,* 159 Ariz. 377, 767 P.2d 725 (App.1988) (directed verdict); *State ex rel. Corbin v. Challenge, Inc.,* 151 Ariz. 20, 725 P.2d 727 (App.1986) (summary judgment). A directed verdict is proper if reasonable minds could not differ on the inferences or conclusions that could be drawn from the evidence, and the party for whom it is granted is entitled to judgment as a matter of law. *Robertson v. Sixpence Inns of America, Inc.,* 163 Ariz. 539, 789 P.2d 1040 (1990).

## PARENTAL IMMUNITY

■ The question whether the parental immunity doctrine applies to foster parents has not been addressed by the Arizona courts. A foster home is defined as:

A home maintained by any individual or individuals having the care or control of minor children, other than those related to each other by blood or marriage, or related to such individuals, or who are legal wards of such individuals.

A.R.S. 8–501(4).

The doctrine of parental immunity originally prohibited a child from bringing a

common law tort action against a natural parent. *See generally* W. Prosser & W. Keeton, *Law of Torts*, § 122 at 904–10 (5th ed. 1984); *Schleier v. Alter*, 159 Ariz. 397, 398, 767 P.2d 1187, 1188 (App.1989). It was first applied in this state to preserve family welfare and unity. *Purcell v. Frazer*, 7 Ariz.App. 5, 8, 435 P.2d 736, 739 (1967). The doctrine was partially abrogated in *Streenz v. Streenz*, 106 Ariz. 86, 471 P.2d 282 (1970), which held that an unemancipated minor could sue a parent for injuries sustained as a result of the parent's negligent driving. The court pointed out that common law has long permitted children to sue parents in property and contract and that the prevalence of liability insurance renders the "domestic tranquility argument" in favor of the parental immunity doctrine "hollow" because in reality the litigation is between the child and the parents' insurance carrier. The *Streenz* court specified that the parental immunity doctrine would continue to apply in two situations:

> (1) Where the alleged negligent act involves an exercise of parental authority over the child; and
>
> (2) Where the alleged negligent act involves an exercise of ordinary parental discretion with respect to the provision of food, clothing, housing, medical and dental services, and other care.

*Id.* at 89, 471 P.2d at 285. A later case holds that the parental immunity doctrine shields a parent from an action for negligent supervision if the parent's breach of duty was to the child alone, instead of to the world at large. *See Sandoval v. Sandoval*, 128 Ariz. 11, 623 P.2d 800 (1981) (leaving gate open so child could wander into street was a breach of duty to the child alone).

If this case involved a lawsuit against natural parents, the parental immunity doctrine would apply. Here, however, we are dealing with a lawsuit against foster parents. Other jurisdictions that have considered the question have concluded that the parental immunity doctrine does *not* apply to foster parents. *See generally* Annot., 55 A.L.R. 4th 778 (1987). For example, in *Mayberry v. Pryor*, 422 Mich. 579, 374 N.W.2d 683 (1985), the Michigan Supreme Court held that foster parents could not invoke parental immunity in an action brought by a foster child for negligent supervision. Michigan, like Arizona, had abolished the parental immunity doctrine except in situations involving supervision and the provision of ordinary care. The court first noted that the majority of cases that gave the benefit of the doctrine to persons standing *in loco parentis* to a child involved stepparents, adoptive parents, grandparents, and other "persons related by blood, marriage, or adoption." 374 N.W.2d at 685; *see, e.g., Thelen v. Thelen*, 174 Mich.App. 380, 435 N.W.2d 495 (1989) (doctrine applies to stepparents). However, with respect to foster parents, the court noted that foster children and foster parents are usually not related by blood, marriage or adoption and are brought together by a contract between the state and the foster parents. *Mayberry*, 422 Mich. at 586, 374 N.W.2d at 685–686. It observed that foster parents are compensated for their expenses and must conform to statutory and regulatory guidelines, that the purpose of the foster home is not to create a new family unit, but to provide a stable, nurturing environment for the child while the natural parent or caretaker attempts to remedy the problem that precipitated the removal of the child, or, if parental rights have been terminated, until suitable adoptive parents are found. *Id.* 374 N.W.2d at 686. The court concluded:

> The clear judicial trend is to abolish or limit the availability of the parental immunity defense to both parents and other caretakers alike. We are similarly persuaded that *the interests of the child outweigh those of the foster parents and that the parental immunity doctrine should not be further extended.* We note, however, that parental immunity from tort liability can be statutorily extended to foster parents if the Legislature so desires.

374 N.W.2d at 689 (emphasis added).

Only one recent case has applied the parental immunity doctrine to foster parents. *See Brown v. Phillips*, 178 Ga.App.

316, 342 S.E.2d 786 (1986). The Georgia court reasoned that because foster parents stand *in loco parentis* to the foster child and are responsible "to discharge the duties of the parental relationship by receiving [the foster child] into their home and caring for him as if he had been their own child," they should be immune from suit. 342 S.E.2d at 787. The court emphasized the preservation of "family tranquility" as the justification for preventing a child from suing a parent or a person standing *in loco parentis.* 342 S.E.2d at 788.

We are persuaded that the parental immunity doctrine should not apply to foster parents who are not related by blood, marriage or adoption to the foster children under their care. Applying the doctrine to preclude recovery by this plaintiff would be contrary to the trend of the law. The very reason for the doctrine's existence—to promote family well-being and tranquility—would not, in our view, be furthered by the application of the doctrine to foster parents like the Blounts. Foster parents do not have the same fundamental liberty interest in the parental relationship that natural parents do. The distinction between the rights of foster parents and natural parents was discussed extensively in *Solomon v. Harman,* 107 Ariz. 426, 489 P.2d 236 (1971), in which the Arizona Supreme Court held that foster parents could not maintain a wrongful death action for the death of a foster child. The court explained that natural parents have rights and duties fixed by law. Foster parents, on the other hand, although standing in *loco parentis,* do not have a legal duty to support a foster child, and significantly, upon assumption of that obligation are "free to cast such obligation at any time." 107 Ariz. at 431, 489 P.2d at 241 (citing *Estate of Harris,* 16 Ariz. 1, 140 P. 825 (1914); *Franklin v. Franklin,* 75 Ariz. 151, 253 P.2d 337 (1953)).

Foster parents must be licensed by the state, *see* A.R.S. §§ 8-501 through 8-515, and by definition take care and control of children who are not related to them by blood or marriage. A.R.S. § 8-501(4). The objective of such a foster home is to pro-vide care, protection and training in a substitute living arrangement for children who cannot remain in their own homes. A.A.C. R6-5-5702. The licensing and monitoring procedures for foster parents already limit foster parenting decisions and control. For example, A.R.S. § 8-513 specifies what type of activities and functions are permitted to foster children. Foster parents are precluded from utilizing certain types of discipline, *see* A.A.C. R6-5-5804(A)(8), or accepting adult boarders into their home. A.A.C. R6-5-5805(11). Additionally, there are time limits on placement in foster homes. A.R.S. § 8-515. Natural parents whose children are living in foster homes retain many legal rights and responsibilities relating to their children, including the right to visitation. A.A.C. R6-5-5708. A foster home license can be denied or revoked for failure to comply with the statutes, for failure to adhere to the standards set forth by A.R.S. § 8-506, DES, or when DES's assessment of the family indicates an inability to meet the physical or emotional needs of children. A.A.C. R6-5-5806.

In light of these distinctions, we conclude that the reasons for the parental immunity doctrine would not be furthered by its application to these foster parents. We limit our holding to foster parents who are not related to the foster child by blood, marriage or adoption, or who are not providing foster care in contemplation of adoption. Any definitive answer to whether foster parents who fall within the latter categories are shielded by the parental immunity doctrine must await decision in a case which presents that question.

SUPERSEDING CAUSE

■ The trial court, in the apparent belief that the negligence of the driver of the car Rebel was riding in superseded any negligence of the foster parent or the state, granted a directed verdict for all the defendants. This was error.

■ A defendant may be liable for his conduct which contributes to the plaintiff's injury. *Ontiveros v. Borak,* 136 Ariz. 500, 505, 667 P.2d 200, 205 (1983). An interven-

ing cause of an injury is one which occurs after the defendant's negligent act and plays a substantial role in the result. *Rossell v. Volkswagen of America,* 147 Ariz. 160, 168, 709 P.2d 517, 525 (1985), *cert. denied, Volkswagen of America v. Rossell,* 476 U.S. 1108, 106 S.Ct. 1957, 90 L.Ed.2d 365 (1986). An intervening cause does not relieve a defendant of liability unless it rises to the level of a superseding cause. An intervening cause becomes a superseding cause when its occurrence "was both unforeseeable and when with the benefit of 'hindsight' it may be described as abnormal or extraordinary." *Rossell,* 147 Ariz. at 169, 709 P.2d at 526.

◼ Where the defendant's conduct "increases the foreseeable risk of a particular harm occurring through the conduct" of another party, the defendant is not relieved of liability. *Ontiveros,* 136 Ariz. at 506, 667 P.2d at 206. In determining whether an intervening cause is superseding, the consideration is whether the defendant's duty

> [I]s designed, in part at least, to protect the other from the hazard of being harmed by the intervening force, or by the effect of the intervening force operating on the condition created by the negligent conduct, then that hazard is within the duty, and the intervening force is not a superseding cause.

*Delozier v. Evans,* 158 Ariz. 490, 493, 763 P.2d 986, 989 (App.1988) (quoting *McFarlin v. Hall,* 127 Ariz. 220, 226, 619 P.2d 729, 735 (1980)).

The defendants contend that Germain's intentional and criminal acts were a superseding cause of the accident which relieves them from liability. Whether Germain's conduct was intentional or unintentional is unimportant. Although the exact details of Germain's conduct might not have been foreseeable, it was entirely foreseeable that Rebel, left unsupervised, would engage in conduct that might lead to just such an accident as occurred. An accident caused by an intoxicated driver who leaves a drinking party is not an extraordinary event. Nor was it unlikely that a seventeen-year-old, without her own means of transportation, would ride with another party-goer. The avoidance of such accidents is one of the reasons for supervising the behavior of teenage children, particularly those who have had previous problems with alcohol and substance abuse. The prevention of what happened here is exactly why the state assumes the care and supervision of minor children whose natural parents are incapable of providing guidance. The trial court erred in granting a directed verdict.

## NEGLIGENT LICENSING/FAILURE TO REVOKE

◼ The Department of Economic Security maintains that the plaintiff is precluded from appealing the issue of negligent licensing of the Blounts as foster parents because she failed to raise this issue in her motion for new trial or to specify it in her notice of appeal. They cite *Sun Lodge, Inc. v. Ramada Development Co.,* 124 Ariz. 540, 606 P.2d 30 (App.1979), for the proposition that the issues on appeal are limited to the issues raised in a motion for new trial. While that is true in an appeal solely from an order denying a motion for new trial, in this case, the notice of appeal was "from judgment in this case and from the denial of the motion for new trial entered on November 14, 1989 in favor of all defendants." *See Matcha v. Winn,* 131 Ariz. 115, 638 P.2d 1361 (App.1981); *Van Dusen v. Registrar of Contractors,* 12 Ariz.App. 518, 472 P.2d 487 (1970). Nor is there any requirement that a partial summary judgment be raised in a motion for new trial in order to be appealable. A.R.S. § 12–2102(A); *but see* A.R.S. § 12–2102(C) (a motion for new trial must be filed before appealing the sufficiency of the evidence to sustain the verdict or judgment in an action tried before a jury). This appeal is not limited to issues raised in the motion for new trial.

◼ Arizona Revised Statutes § 12–2102(A) also provides that the appellate courts shall, in an appeal from a final judgment, "review any intermediate orders involving the merits of the action and necessarily affecting the judgment, and all or-

ders and rulings assigned as error, whether a motion for new trial was made or not." An "intermediate order" is one made between commencement of the action and final judgment, which is not separately appealable. *Beavers v. Beavers*, 55 Ariz. 122, 126, 99 P.2d 95, 97 (1940); *Miami Copper Co. v. Strohl*, 14 Ariz. 410, 130 P. 605 (1913) (both interpreting a former statute, Rev.Code 1928 § 3660). The trial court granted the state's motion for summary judgment by minute entry. No formal order to that effect including Rule 54(b) language, Arizona Rules of Civil Procedure, was subsequently entered. Therefore, the summary judgment was not appealable until the entry of final judgment.

■ Appellees also suggest that this court does not have jurisdiction to consider this issue because it was not described in the notice of appeal as required by Rule 8(c), Arizona Rules of Civil Appellate Procedure. As noted above, the notice of appeal specified that it was from the denial of the motion for new trial and the judgment. Rule 8(c), Arizona Rules of Civil Appellate Procedure, requires a notice of appeal to "specify the party or parties taking the appeal [and to] designate the judgment or part thereof appealed from...." There is no requirement that the notice designate intermediate orders which are to be raised as issues on appeal.

■ We turn to the merits of the negligent licensing issue. Summary judgment was granted on the basis of A.R.S. § 12–820.02(5), which provides in pertinent part:

Unless a public employee acting within the scope of his employment intended to cause injury or was grossly negligent, neither a public entity nor a public employee is liable for:

. . . .

5. The issuance of or failure to revoke or suspend any permit, license, certificate, approval, order or similar authorization for which absolute immunity is not provided pursuant to § 12–820.01.

Neither party suggests that the state or DES intended to cause injury by licensing the Blounts as foster parents, and they agree that the statute precludes liability except for gross negligence. To be grossly negligent, the actor's conduct must create an unreasonable risk of physical harm to another, and such risk must be substantially greater than the risk involved in ordinary negligence. *See Kemp v. Pinal County*, 13 Ariz.App. 121, 124, 474 P.2d 840, 843 (1970) (quoting *Restatement (Second) of Torts* § 500). The Second Circuit, in a case brought pursuant to 42 U.S.C. § 1983 against the New York City Department of Social Services for damages resulting from the negligent placement and supervision of a foster child, pointed out that deliberate indifference (necessary to maintain the § 1983 action) was closely intertwined with gross negligence and that the distinction between gross and ordinary negligence was not so obvious in practice. *Doe v. New York City Dept. of Social Services*, 649 F.2d 134, 143 (2nd Cir.1981), *cert. denied, Catholic Home Bureau v. Doe*, 464 U.S. 864, 104 S.Ct. 195, 78 L.Ed.2d 171 (1983).

Viewing the facts most favorably to plaintiff, there is sufficient evidence from which a jury could conclude that the state was grossly negligent. There was evidence that DES knowingly placed the plaintiff in a level one home when she needed to be in a level three home. In addition, DES had been notified of several incidents involving the lack of supervision and drinking by foster children in the Blount home. A closer look at the Blount home prior to Rebel's accident might have revealed that the Blounts' supervision of their foster children was inadequate or that they were unable to provide emotional support or a therapeutic environment, as required by statute, failures which are ground for revocation. There was evidence that the Blounts were having marital problems and that William Blount had a drinking problem. A reasonable mind could conclude that these types of problems should have precluded DES from licensing the Blounts as foster parents in the first place, and that to license them without an adequate investigation, or despite these problems, was gross negligence.

## 14

## EVIDENTIARY RULINGS

The plaintiff raises several issues regarding evidentiary rulings made during trial. Since the case may be retried, we will address them briefly.

Appellant first argues that the trial court unduly restricted the plaintiff's opening statement, and that the trial court repeatedly interrupted counsel, thereby prejudicing the plaintiff in the eyes of the jury. Our review of the record shows that the trial judge did not abuse his discretion with respect to the opening statement.

The trial court refused to allow the plaintiff to impeach Debra Blount with a statement Blount had made to an investigator for the plaintiff before suit was filed. The transcript of the trial does not reveal just what testimony counsel intended to impeach, or specifically, what Debra Blount had said to the investigator that was inconsistent with what she said at trial. The record does show, however, that the judge sustained the defendant's objection to the attempt to impeach on the basis that the prior statements had somehow been obtained in an unethical manner. The plaintiff vehemently denied this, both to the trial judge and in oral argument before this court. At oral argument before this court, counsel for the defendants could not explain, and declined to press, the accusation of impropriety that would justify a refusal to allow the impeachment. It appears, on the record before us, that the trial judge should not have sustained the objection on the grounds advanced.

The plaintiff argues that the trial court improperly precluded an expert witness, Dr. Donald Fausel, from relating the facts which formed the basis for his opinion concerning the plaintiff's placement and supervision. The trial court ruled that Dr. Fausel could not testify based upon facts in a hearsay report. The report upon which Fausel based his testimony, and from which he began to read at trial was not, however, submitted as evidence in the form of an offer of proof, nor was the content apparent from the record. *See* Rule 103, Arizona Rules of Evidence. We cannot say, in the absence of a sufficient record, that the trial court erred in this respect.

The plaintiff also argues that the trial court abused its discretion in precluding expert testimony that a driver with a .147% blood-alcohol content is twenty times more likely to be involved in an accident, than is a sober driver. The defendants argue that because the relationship between drinking and automobile accidents is within the common knowledge of the jury, expert testimony on this point was not necessary and that the precise percentage of the increased likelihood of an accident was not relevant to the jury's determination of negligence against DES and the Blounts. We agree. The ultimate question on the admissibility of expert testimony is whether the expert can provide appreciable help to the jury. *Englehart v. Jeep*, 122 Ariz. 256, 258–59, 594 P.2d 510, 512–13 (1979). The jury undoubtedly knew that an intoxicated driver is far more likely to cause an accident than a sober driver. The percentage of increased probability adds little to the ultimate issues in this case—whether DES or the Blounts, or both, were negligent, especially in view of the fact that there was no showing that the defendants were aware of the precise increase in probability. The trial court did not abuse its discretion by excluding this testimony.

The judgment of the trial court is reversed and this matter is remanded for a new trial.

BROOKS, P.J., and LANKFORD, J., concur.