907 P.2d 43

**Christopher BROADBENT, a minor, by his Conservator, Phillip E. BROAD-BENT, Plaintiff-Appellant,**

v.

**Laura J. BROADBENT, Defendant-Appellee,**

**NORTHBROOK INDEMNITY COMPANY, Real Party in Interest-Appellee.**

No. CV-93-0378-PR.

Supreme Court of Arizona,
En Banc.

Nov. 14, 1995.

Kern and Wooley by Robert L. Greer, Mesa, for Plaintiff-Appellant Christopher Broadbent, a minor, by his Conservator, Phillip E. Broadbent.

Ridenour, Swenson, Cleere & Evans, P.C. by James W. Evans, Phoenix, for Defendant-Appellee Laura J. Broadbent.

Ulrich, Kessler & Anger, P.C. by Paul G. Ulrich, Donn G. Kessler, Phoenix, Musick, Peeler & Garrett by Wayne B. Littlefield, Lynn A. O'Leary, Los Angeles, CA, for Real Party in Interest Northbrook Indemnity Company.

## OPINION

CORCORAN, Justice.

We must determine whether the doctrine of parental immunity bars Christopher Broadbent's action against his mother for negligence. We also discuss the viability of the line of Arizona cases creating and refining the parental immunity doctrine. We have jurisdiction pursuant to article 6, § 5(3) of the Arizona Constitution, and rule 23, Arizona Rules of Civil Appellate Procedure.

## FACTS AND PROCEDURAL HISTORY

### I. Facts

Christopher and his mother, Laura J. Broadbent, went swimming at the family residence on April 13, 1984, their first day of

swimming that year. Christopher was wearing "floaties," which are inflatable rings worn on the arms to assist a child in staying afloat. Laura understood that a child could still drown while wearing floaties and should be supervised. At the time of the accident, Christopher was two-and-a-half years old and did not know how to swim.

Laura and Christopher were by the side of the pool when the telephone rang. Laura left Christopher alone by the pool to answer the phone. Laura saw Christopher remove his floaties before she answered the phone. Laura talked on the phone 5 to 10 minutes and could not see Christopher from where she was talking. She also did not have on her contact lenses. Laura said that if she stretched the phone cord and her body, she could see the pool area, but when she did this, she could not see Christopher. She dropped the phone, ran toward the pool, and found Christopher floating in the deep end of the pool.

Laura administered cardio-pulmonary resuscitation and telephoned for the paramedics. Neither Laura nor the paramedics were able to revive Christopher. The paramedics took Christopher to the hospital where he was finally revived. As a result of this near drowning, Christopher suffered severe brain damage because of lack of oxygen. He has lost his motor skills and has no voluntary movement.

## II. Procedural History

The coverage issue between State Farm Fire & Casualty Co. and the Broadbents was resolved by stipulation and order in the court of appeals. *Broadbent v. Broadbent*, 178 Ariz. 53, 54, 870 P.2d 1149, 1150 (App.1993). Therefore, that action is not reflected in the caption of this opinion or in the text.

A complaint was filed on behalf of Christopher, as plaintiff, against his mother, alleging that she was negligent and caused his injuries. This action was brought to involve the Broadbents' umbrella insurance carrier in the issue of coverage. In her answer, Laura admitted that she was negligent in her supervision of Christopher, and she moved for summary judgment, arguing that the doctrine of parental immunity applied. All parties to both the declaratory judgment action and the negligence action filed a stipulation to consolidate the cases, and the trial court ordered the consolidation. The trial court granted Laura's motion for summary judgment and ruled that the parental immunity doctrine applied to the facts of this case.

Phillip Broadbent, as Conservator for Christopher, appealed to the court of appeals. The parties stipulated that: (1) the real party in interest was Northbrook Indemnity Company, who provided personal umbrella liability insurance coverage for Laura Broadbent on the date of the accident; (2) Laura may be entitled to indemnity from Northbrook if Laura is liable for the injuries to Christopher; (3) Laura did not want to defend the action but agreed that Northbrook should be permitted to defend; and (4) the only issue in the case was whether the doctrine of parental immunity applied. The court of appeals ordered that Northbrook be permitted to appear and defend the case.

The court of appeals affirmed the trial court, finding that under the parental immunity doctrine the mother was not liable for her child's injuries. *Broadbent*, 178 Ariz. at 58, 870 P.2d at 1154. The court of appeals held that this case was most closely analogous to *Sandoval v. Sandoval*, 128 Ariz. 11, 623 P.2d 800 (1981), which involved negligent supervision of a child by a parent, and rejected the argument that the mother's duty to the child arose out of a duty to the world at large to protect all children from the pool. *Broadbent*, 178 Ariz. at 56–57, 870 P.2d at 1152–53. The court of appeals also rejected Christopher's arguments that (1) the injuries were caused by an instrumentality under the control of the mother, and therefore the doctrine of parental immunity did not apply; and (2) Arizona should further limit application of parental immunity in accord with Wisconsin cases from which Arizona's standard was originally derived. *Broadbent*, 178 Ariz. at 57–58, 870 P.2d at 1153–54.

Judge Kleinschmidt dissented and agreed with Christopher's argument that the mother owed a duty to the world to supervise the swimming pool, and therefore the doctrine of parental immunity did not apply. *Broad-*

*bent*, 178 Ariz. at 59, 870 P.2d at 1155 (Kleinschmidt, J., dissenting) (finding this case more closely analogous to *Streenz v. Streenz*, 106 Ariz. 86, 471 P.2d 282 (1970), and *Schleier v. Alter*, 159 Ariz. 397, 767 P.2d 1187 (App.1989)).

The court of appeals noted that it based its decision on an application of the current status of the parental immunity doctrine in Arizona and that any departure or modification of the established case law was "for the supreme court to determine" and not the court of appeals. *Broadbent*, 178 Ariz. at 58, 870 P.2d at 1154. We agree and do so in this opinion today.

## DISCUSSION

### I.  History and Purpose of the Parental Immunity Doctrine

#### A.  The Origins of Parental Immunity

We begin by stating a few basic facts about the treatment of children under the law and family immunities. Under common law, a child has traditionally been considered a separate legal entity from his or her parent. *See* W. Page Keeton, Dan B. Dobbs, Robert E. Keeton, and David G. Owen, *Prosser and Keeton on the Law of Torts* § 122, at 904 (5th ed. 1984) (*Prosser & Keeton*); Martin J. Rooney & Colleen M. Rooney, *Parental Tort Immunity: Spare the Liability, Spoil the Parent*, 25 New Eng.L.Rev. 1161, 1162 (1991). Children have generally been allowed to sue their parents in property and contract actions. *Goller v. White*, 20 Wis.2d 402, 122 N.W.2d 193, 197 (1963); Gail D. Hollister, *Parent–Child Immunity: A Doctrine in Search of Justification*, 50 Fordham L.Rev. 489, 497 (1982) (*Parent–Child Immunity*). In contrast, at common law the courts merged the identity of husband and wife; therefore, spousal immunity prohibited any action by a wife against her husband because to do so would have been to sue herself. *Parent–Child Immunity*, at 496–97; *see also Windauer v. O'Connor*, 13 Ariz.App. 442, 442–45, 477 P.2d 561, 562–65 (1970) (holding that doctrine of spousal immunity did not bar action by former wife against

divorced husband for personal injuries sustained when husband shot wife during marriage). The doctrine of spousal immunity has been abolished and there has not been a prohibition against siblings suing each other. *See* Jefferson L. Lankford & Douglas A. Blaze, *Law of Negligence in Arizona* § 5.3(1)(a), at 106 (1992) (noting that Arizona has joined majority of states by abolishing doctrine of interspousal immunity).

■ The doctrine of parental immunity is an American phenomenon unknown in the English common law. *See Gibson v. Gibson*, 3 Cal.3d 914, 92 Cal.Rptr. 288, 289, 479 P.2d 648, 649 (1971); *Cates v. Cates*, 156 Ill.2d 76, 189 Ill.Dec. 14, 20, 619 N.E.2d 715, 721 (1993); *Prosser & Keeton* § 122, at 904. Courts in Canada and Scotland have held that children may sue their parents in tort. *See Gibson*, 92 Cal.Rptr. at 289, 479 P.2d at 649; *Prosser & Keeton* § 122, at 904.

In early American history, children were viewed as "evil and in need of strict discipline," and the courts recognized wide parental discretion. *Parent–Child Immunity*, at 491–92. There was a strong presumption that parental discipline was proper. *See, e.g.*, S.C.Code Ann. § 16–3–40 (Law.Co-op.1976) (statute originating from 1712 that provided a defense to "[k]illing by stabbing or thrusting" if done while chastising or correcting your child). Only recently has the state intervened to protect children. *See, e.g.*, A.R.S. §§ 8–501 to –550.01 (child welfare and placement). Viewed against this backdrop, it is not surprising that no American child had sought recovery against a parent for tortious conduct until the late nineteenth century.

In *Hewlett v. George*, 68 Miss. 703, 711, 9 So. 885, 887 (1891),[1] the Supreme Court of Mississippi held, without citation to legal authority, that a child could not sue her parent for being falsely imprisoned in an insane asylum because of parental immunity, a doctrine which that court created from whole cloth. As its rationale, the court stated:

> [S]o long as the parent is under obligation to care for, guide and control, and the child

---

1.  We refer the reader to the Mississippi Reports because it contains additional facts from the circuit court and the complete (and correct) names of the parties.

is under reciprocal obligation to aid and comfort and obey, no such action as this can be maintained. The peace of society, and of the families composing society, and a sound public policy, designed to subserve the repose of families and the best interests of society, forbid to the minor child a right to appear in court in the assertion of a claim to civil redress for personal injuries suffered at the hands of the parent. *Hewlett*, 68 Miss. at 711, 9 So. at 887.

*Hewlett* was followed by two cases that were also decided on parental immunity grounds, and these came to be known as the "great trilogy" of cases establishing the parental immunity doctrine. In *McKelvey v. McKelvey*, the Tennessee Supreme Court held that a minor child could not sue her father for "cruel and inhuman treatment" allegedly inflicted by her stepmother with the consent of her father. 111 Tenn. 388, 77 S.W. 664, 664–65 (1903). *McKelvey* cited *Hewlett* as the only authority for the doctrine of parental immunity and analogized the parent-child relationship to that of the husband-wife relationship, noting that the basis for the spousal immunity was, in part, the fact that husband and wife are a legal entity. *McKelvey*, 77 S.W. at 664–65.

In *Roller v. Roller*, the Supreme Court of Washington cited *Hewlett* and held that a minor child could not sue her father for rape, even though he had been convicted of the criminal violation, because of the doctrine of parental immunity. *Roller*, 37 Wash. 242, 79 P. 788, 788–89 (1905). The *Roller* court argued that if the child recovered a money judgment from the parent and then died, the parent would then become heir to the property that had been taken from him. 79 P. at 789. In addition, *Roller* argued that "the public has an interest in the financial welfare of other minor members of the family, and it would not be the policy of the law to allow the estate, which is to be looked to for the support of all the minor children, to be appropriated by any particular one." 79 P. at 789.

This "great trilogy" was the inauspicious beginning of the doctrine of parental immunity, which was soon embraced by almost every state. *Parent–Child Immunity*, at 494 n. 39,

495 (noting that doctrine was adopted by all but 7 states). However, the courts soon began fashioning several exceptions to the doctrine, and in several states the doctrine has been abolished. *See Gibson*, 479 P.2d at 650, 653 (noting erosion of doctrine in the United States and abolishing immunity in California except for conduct not in keeping with "reasonable parent" test); *Glaskox v. Glaskox*, 614 So.2d 906, 909–11 (Miss.1992) (abolishing parental immunity where minor injured as result of parents' negligence in car accident). In several situations, parental immunity does not apply: if the parent is acting outside his parental role and within the scope of his employment; if the parent acts willfully, wantonly, or recklessly; if the child is emancipated; if the child or parent dies; if a third party is liable for the tort, then the immunity of the parent does not protect that third party; and if the tortfeasor is standing *in loco parentis*, such as a grandparent, foster parent, or teacher, then the immunity does not apply, *see Rourk v. State*, 170 Ariz. 6, 10–11, 821 P.2d 273, 277–78 (App.1991) (holding that doctrine of parental immunity did not apply to foster parents). *See 4 Restatement (Second) of Torts* § 895G, at 428–30 (1979) (listing longstanding exceptions to parental immunity doctrine); *Prosser & Keeton* § 122, at 906–07.

## B. Parental Immunity in Arizona

■ In 1967 the doctrine of parental immunity was first recognized in Arizona in *Purcell v. Frazer*, 7 Ariz.App. 5, 8–9, 435 P.2d 736, 739–40 (1967). In *Purcell*, the Arizona Court of Appeals held that the doctrine of parental immunity prohibited children from suing their parents for injuries resulting from a car accident allegedly caused by the parents' negligence. 7 Ariz. App. at 7–9, 435 P.2d at 736–40. *Purcell*, however, was soon overruled in 1970 by *Streenz v. Streenz*, which held that an unemancipated minor could sue her parents for injuries resulting from a car accident. *Streenz*, 106 Ariz. 86, 88–89, 471 P.2d 282, 284–85 (1970). In *Streenz*, this court adopted the standard from the Wisconsin Supreme Court set forth in *Goller v. White*, 20 Wis.2d 402, 122 N.W.2d 193, 198 (1963).

*Streenz,* 106 Ariz. at 89, 471 P.2d at 285. Under the *Goller* standard, parental immunity is abrogated except:

> (1) where the alleged negligent act involves an exercise of parental authority over the child; and
>
> (2) where the alleged negligent act involves an exercise of ordinary parental discretion with respect to the provision of food, clothing, housing, medical and dental services, and other care.

*Streenz,* 106 Ariz. at 89, 471 P.2d at 285, quoting *Goller,* 122 N.W.2d at 198. The cases following *Streenz* show the difficulty in applying this ambiguous standard.

In *Sandoval v. Sandoval,* a child sued his parents alleging that his father had negligently left the gate open, which allowed the 4–year–old child to ride his tricycle from the front yard into the street where he was run over by a car. 128 Ariz. 11, 11, 623 P.2d 800, 800 (1981). In *Sandoval,* this court devised a new test for applying the standard set forth in *Streenz:* the parent would not be immune if the parent had a duty to the world at large. *Sandoval,* 128 Ariz. at 13, 623 P.2d at 802. If the parent's duty was "owed to the child alone and a part of the parental 'care and control' or 'other care' to be provided by the parents," then the parent was immune from liability. *Sandoval,* 128 Ariz. at 13–14, 623 P.2d at 802–03. The court held that "the act of leaving a gate open should not subject the plaintiff's parents to suit." *Sandoval,* 128 Ariz. at 14, 623 P.2d at 803. Further, the court noted that it did not limit the abrogation of the parental immunity doctrine to negligence in car accident cases and would, instead, "continue to consider, on a case by case basis, the actual cause of the injury and whether the act of the parent breached a duty owed to the world at large, as opposed to a duty owed to a child within the family sphere." *Sandoval,* 128 Ariz. at 14, 623 P.2d at 803. The court reasoned that when a parent was driving a car, he had a duty to the world to drive carefully, whereas the duty to close the gate was a duty owed only to the child, and that the direct cause of the child's injuries in *Sandoval* was the car that struck him in the street, not the gate being open. *Sandoval,* 128 Ariz. at 13, 623 P.2d at 802.

Applying *Sandoval,* the court in *Schleier v. Alter* held that the parents had a duty to the world at large and therefore were not immune from liability. *Schleier,* 159 Ariz. 397, 399–400, 767 P.2d 1187, 1189–90 (App.1989). In that case, the family dog, which had a history of attacking children, bit the Alters' 11–month–old child. *Schleier,* 159 Ariz. at 398, 767 P.2d at 1188. The court of appeals characterized the duty that the parents owed as a general duty to the world to supervise their dog, which the court found to be the equivalent of a "dangerous instrumentality" to children. *Schleier,* 159 Ariz. at 400, 767 P.2d at 1190.

The most recent Arizona case on parental immunity found the doctrine to be applicable. In *Sandbak v. Sandbak,* the Sandbaks' child wandered onto the next door neighbors' property where the neighbors' pit bull terrier severely mauled her. 166 Ariz. 21, 22, 800 P.2d 8, 9 (App.1990). The parents knew that the next door neighbors owned pit bull terriers and that their daughter had a habit of wandering onto the neighbors' property. *Sandbak,* 166 Ariz. at 22, 800 P.2d at 9. The court held that the child's claim of negligent supervision was barred, rejecting the child's argument that immunity only applied to parents' negligence with regard to legal obligations. *Sandbak,* 166 Ariz. at 23, 800 P.2d at 10. The court rejected the Wisconsin Supreme Court's limiting interpretation of the *Goller* test in *Thoreson v. Milwaukee & Suburban Transport Co.,* 56 Wis.2d 231, 201 N.W.2d 745, 753 (1972), which held that acts involving an "exercise of discretion with 'respect to the provision of food, clothing, housing, medical and dental services, *and other care*'" meant that parents were allowed "discretion in performing their legal duties." (Emphasis added.) In *Thoreson,* the Wisconsin court concluded that the parent was not immune from liability for negligently supervising her child who wandered out of the house and into the street where he was injured. 201 N.W.2d at 747, 753.

Further, in *Sandbak,* the Arizona Court of Appeals rejected the argument that allowing the child to trespass on the neighbors' prop-

erty was a violation of the parents' duty to the world at large, finding that violation of that duty, if it even existed, was not the proximate cause of the injury. *Sandbak*, 166 Ariz. at 23, 800 P.2d at 10.

## C. Analysis of the Policy Reasons Advanced in Support of Parental Immunity

Courts and commentators have postulated many policy reasons for the parental immunity doctrine. The primary justifications for this immunity are:

(1) Suing one's parents would disturb domestic tranquility;

(2) Suing one's parents would create a danger of fraud and collusion;

(3) Awarding damages to the child would deplete family resources;

(4) Awarding damages to the child could benefit the parent if the child predeceases the parent and the parent inherits the child's damages; and

(5) Suing one's parents would interfere with parental care, discipline, and control.

*Streenz*, 106 Ariz. at 87 n. 1, 471 P.2d at 283 n. 1; *see also Gibson*, 479 P.2d at 651; *Cates*, 619 N.E.2d at 720; *Prosser & Keeton* § 122, at 905. We believe that all of these justifications provide weak support for the parental immunity doctrine.

The injury to the child, more than the lawsuit, disrupts the family tranquility. In fact, if the child is not compensated for the tortious injury, then peace in the family is even less likely. In the seminal Arizona case on parental immunity, the court recognized that family tranquility would not be disturbed if the parents had liability insurance. *Purcell*, 7 Ariz.App. at 8, 435 P.2d at 739.

This fear of upsetting the family tranquility also seems unrealistic when we consider how such a lawsuit is initiated. The parent most often makes the decision to sue himself, and the parent is in effect prepared to say that he was negligent. *See* Comment, *The "Reasonable Parent" Standard: An Alternative to Parent–Child Tort Immunity*, 47 U.Colo.L.Rev. 795, 798–99 (1976).

The danger of fraud and collusion is present in all lawsuits. We should not deny recovery to an entire class of litigants because some litigants might try to deceive the judicial system. The system can ferret out fraudulent and collusive behavior in suits brought by children against their parents just as the system detects such behavior in other contexts.

We note, too, that both of these arguments—disturbing domestic tranquility and danger of fraud and collusion—were also justifications for spousal immunity, which has been abrogated in Arizona. These same concerns could justify an immunity from suits brought by one sibling against another; however, this is an immunity that the courts have not felt the need to create. Furthermore, one of the justifications for spousal immunity was that husband and wife were considered a single legal entity, yet this legal fiction was not applied to the parent-child relationship. As noted earlier, children have always been able to maintain actions against their parents in contexts other than negligence actions, such as contract actions or for willful conduct by the parent. Therefore, the reliance on spousal immunity as a justification for parental immunity is not sound. *See McKelvey*, 77 S.W. at 665.

A damage award for the child will not deplete, or unfairly redistribute, the family's financial resources. These cases will generally not be brought if no insurance coverage is available, and therefore the worry that the family's resources will be depleted for the benefit of one child is illusory. The opposite is true. If a child has been seriously injured and needs expensive medical care, then a successful lawsuit against the parent and subsequent recovery from the insurance company could ease the financial burden on the family. It would not be a viable rule to say that liability only exists where insurance exists, but we recognize that lawsuits generally will be brought when there is potential insurance coverage.

The possibility that the parent might inherit money recovered by the child is remote. This becomes a concern only if the parent inherits as a beneficiary under intestate succession laws. This is a concern for the pro-

bate courts and the laws of intestate succession, not tort law. The remedy would be to prohibit inheritance by the parent—not to deny recovery to the injured child. *See Parent–Child Immunity*, at 497–98.

The Arizona courts have embraced the rationale that allowing a child to sue a parent would interfere with parental care, discipline, and control. *See Streenz*, 106 Ariz. at 89, 471 P.2d at 285. We have cited with approval the Wisconsin Supreme Court's statement that:

> [a] new and heavy burden would be added to the responsibility and privilege of parenthood, if within the wide scope of daily experiences common to the upbringing of children a parent could be subjected to a suit for damages for each failure to exercise care and judgment commensurate with the risk.

*Sandoval*, 128 Ariz. at 13, 623 P.2d at 802, quoting *Lemmen v. Servais*, 39 Wis.2d 75, 158 N.W.2d 341, 344 (1968).

The justification that allowing children to sue their parents would undercut parental authority and discretion has more appeal than the other rationales. However, if a child were seriously injured as a result of the exercise of parental authority, such as by a beating, then it would constitute an injury willfully inflicted, and parents are generally not immune for willful, wanton, or malicious conduct. *See* Annotation, *Liability of Parent or Person In Loco Parentis for Personal Tort Against Minor Child*, 19 A.L.R.2d 423, 451–54 (1951). Furthermore, such a willful beating would probably constitute child abuse and could be criminally prosecuted. *See* A.R.S. § 8–546 (Supp.1994).[2]

We want to protect the right of parents to raise their children by their own methods and in accordance with their own attitudes and beliefs. The New York Court of Appeals aptly stated this concern:

> Considering the different economic, educational, cultural, ethnic and religious

backgrounds which must prevail, there are so many combinations and permutations of parent-child relationships that may result that the search for a standard would necessarily be in vain.... For this reason parents have always had the right to determine how much independence, supervision and control a child should have, and to best judge the character and extent of development of their child.

*Holodook v. Spencer*, 36 N.Y.2d 35, 364 N.Y.S.2d 859, 867, 324 N.E.2d 338, 346 (1974), quoting *Holodook v. Spencer*, 43 A.D.2d 129, 350 N.Y.S.2d 199, 204 (1973). Though we recognize the importance of allowing parental discretion, we disagree that our searching for a standard would be "in vain." Parents do not possess unfettered discretion in raising their children.

## II. The Abolishment of Parental Immunity and Adoption of the "Reasonable Parent" Standard for Parent–Child Suits

Although the above concerns make it difficult to draft a proper standard for the type of action a child may maintain against a parent, we will attempt to do so. We need to "fashion an objective standard that does not result in second-guessing parents in the management of their family affairs." *Parent–Child Immunity*, at 490. First, we should make clear what the standard is *not*. We reject and hereby overrule *Sandoval*, which created the "duty to the world at large versus duty to the child alone" distinction. 128 Ariz. at 13–14, 623 P.2d at 802–03. This distinction is not capable of uniform application and has no connection with the rationale for parental immunity. This is especially evident when we compare the facts of *Schleier* and *Sandbak*.

In *Schleier*, the negligent act was failure to restrain a dog, and the court found that this was a duty to the world; therefore, parental immunity did not apply. 159 Ariz. at 400–01, 767 P.2d at 1190–91. In *Sandbak*, the negli-

---

**2.** "Abuse" is defined in § 8–546 as

the infliction or allowing of physical injury, impairment of bodily function or disfigurement or the infliction of or allowing another person to cause serious emotional damage as evidenced by severe anxiety, depression, with-

drawal or untoward aggressive behavior ... and which is caused by the acts or omissions of an individual having *care, custody and control of a child.*

(Emphasis added.)

gent act was failure to supervise a child who was bitten by a neighbor's dog, and the court found this was a duty to the child alone; therefore, parental immunity applied. 166 Ariz. at 23, 800 P.2d at 10. The children in *Schleier* and *Sandbak* suffered similar injuries; neither case involved parental discipline, and neither case involved the "provision of food, clothing, housing, medical and dental services, and other care," unless "other care" is broadly defined. Both cases involved the negligent supervision of children. If we were to hold that parents are immune for negligent supervision of children, then the issue of liability would revolve around whether an activity could be described as "supervision" and whether lack of supervision was the cause of the injury. This would not involve a consideration of whether the activity infringed on the parents' discretionary decisions regarding care, custody, and control. Almost everything a parent does in relation to his child involves "care, custody, and control."

We add that parents always owe a parental duty to their minor child. The issue of liability should revolve around whether the parents have breached this duty and, if so, whether the breach of duty caused the injury.

In accord with the California Supreme Court, "we reject the implication of *Goller* [which this court approved in *Streenz*] that within certain aspects of the parent-child relationship, the parent has carte blanche to act negligently toward his child.... [A]lthough a parent has the prerogative and the duty to exercise authority over his minor child, this prerogative must be exercised within reasonable limits." *Gibson*, 479 P.2d at 652–53. We hereby reject the *Goller* test as set forth in *Streenz*, and we approve of the "reasonable parent test," in which a parent's conduct is judged by whether that parent's conduct comported with that of a reasonable and prudent parent in a similar situation. *Gibson*, 479 P.2d at 653.

A parent is not immune from liability for tortious conduct directed toward his child solely by reason of that relationship. *See* 4 *Restatement (Second) of Torts* § 895G, at 426. And, a parent is not liable for an act or omission that injured his child if the parent acted as a reasonable and prudent parent in the situation would.

## III. Application to the Present Case

In this case, the trier of fact may find that the mother, Laura Broadbent, did not act as a reasonable and prudent parent would have in this situation. The finder of fact must determine whether leaving a two-and-a-half year old child unattended next to a swimming pool is reasonable or prudent. We fail to see why parents should not be held liable for negligence in failing to supervise their own children near the pool, when their liability would be clear had the children not been their own. We think that in most cases, if not all, the standard of care owed to a parent's own child is the same as that owed to any other child.

The paradox of parental immunity can be seen if we assume that a neighbor child from across the street was a guest and was injured at the same time and under the same circumstances as Christopher. Should the neighbor child be permitted to sue and recover damages from Laura but Christopher be denied the same opportunity?

A parent may avoid liability because there is no negligence, but not merely because of the status as parent. Children are certainly accident prone, and oftentimes those accidents are not due to the negligence of any party. The same rules of summary judgment apply to these cases as to others, and trial courts should feel free to dismiss frivolous cases on the ground that the parent has acted as a reasonable and prudent parent in a similar situation would. *See Gibson*, 479 P.2d at 653.

## CONCLUSION

We vacate the court of appeals' decision in this case, reverse the trial court's rulings on summary judgment, and remand to the trial court for proceedings consistent with this opinion. Laura Broadbent is not immune from liability in this case because of the doctrine of parental immunity, which we hereby abolish. We overrule *Sandoval* on the issue of parental immunity and no longer

**82**

follow the *Goller* test as adopted in *Streenz.* See *Sandoval,* 128 Ariz. at 14, 623 P.2d at 803; *Streenz,* 106 Ariz. at 89, 471 P.2d at 285.

MOELLER, V.C.J., and ZLAKET and MARTONE, JJ., concur.

FELDMAN, Chief Justice, specially concurring.

I join in the abrogation of parental immunity and the court's adoption of the reasonable and prudent parent test but write separately to sound a note of caution. Although we abolish a rule of tort immunity, we must bear in mind that "difficult problems" remain in "determining when a physical harm should be regarded as actionable." RESTATEMENT (SECOND) OF TORTS § 895G cmt. k. If the alleged tortious conduct does not grow out of the family relationship, the question of negligence "may be determined as if the parties were not related." *Id.* However, there are areas of broad discretion in which only parents have authority to make decisions. In these areas, I agree with the RESTATEMENT'S view that "the standard of a reasonable prudent parent ... recognize[s] the existence of that discretion and thus ... require[s] that the [parent's] conduct be palpably unreasonable in order to impose liability." *Id.* If, however, the charged breach of duty falls outside the area of a parent's discretionary authority and is, instead, within the obligation of due care owed by anyone who has supervisory or other responsibility for another's safety, then the test should be much more flexible.

Thus, the parent who decides to enroll a two-year-old child in swimming lessons at a neighborhood pool operates within the realm of parent-child decision-making. Although the child might be hurt during the course of such lessons, the decision to put the child in that position is peculiarly a matter of parental authority rather than a question of supervisory care or performance. Under the proper application of the reasonable and prudent parent test, as a matter of law there should be no liability unless one could say the decision was palpably unreasonable under given circumstances.

The facts of this case illustrate the other side of the coin. The act of leaving an unsupervised two-year-old child, who was unable to swim, at the side of a swimming pool was not an exercise of parental decision-making but an inadvertent act in the performance of duties owed by a caretaker. As the RESTATEMENT indicates, the reasonable and prudent parent test extends a great deal of flexibility to the first example but much less, if any, to the second.